SARAH E. HALL, Conservator of the Estate and Person of Paul A. Hall, Plaintiff, v. ARCHER-DANIELS-MIDLAND COMPANY, Defendant and Third-Party Plaintiff-Appellee (Mid-States General and Mechanical Contracting Corporation, Defendant; Corrigan Company, Third Party Defendant-Appellant)—SARAH E. HALL, Conservator of the Estate and Person of Paul A. Hall, Plaintiff, v. ARCHER-DANIELS-MIDLAND COMPANY, Defendant and Third-Party Plaintiff-Appellee (Mid-States General and Mechanical Contracting Corporation, Defendant-Appellant; Corrigan Company, Third-Party Defendant).

Fourth District   Nos. 4—85—0330, 4—85—0369 cons.

Opinion filed April 7, 1986.—Rehearing denied May 6, 1986.

Heyl, Royster, Voelker & Allen, of Springfield (Frederick P. Velde and Ray E. Alexander, of counsel), for appellant Corrigan Company.

Grady E. Holley, of Holley, Keith & Mehlick , of Springfield, for appellant Mid-States General & Mechanical Contracting Corporation.

Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll, Edward J. Murphy, and C. Barry Montgomery, of counsel), for appellee.

JUSTICE WEBBER delivered the opinion of the court:

These consolidated appeals are brought from a jury verdict and judgment entered thereon in the circuit court of Sangamon County finding the amounts of contribution for which the several parties are liable under a settlement agreement reached with the original plaintiff.

Sarah E. Hall, as conservator of the estate and person of Paul A. Hall, brought suit under the Structural Work Act (Ill. Rev. Stat. 1983, ch. 48, par. 60 *et seq.*) against Archer-Daniels-Midland Company (ADM) and Mid-States General and Mechanical Contracting Company (Mid-States) for injuries suffered by Paul A. Hall when he fell through

a catwalk at the ADM plant. ADM, acting as its own contractor, was engaged in a $50 million expansion project at its Decatur plant, known as the North Steep Tank Addition. A "steep" is a large stainless steel silo into which hot water and sulfur dioxide are introduced; the corn in the silo then ferments for a period of time sufficient to extract the solubles and render the rest suitable for grinding, milling, and separation.

ADM contracted with Mid-States to do the structural steel erection around the steep tanks. Corrigan Company (Corrigan) was engaged to do the pipe fitting. Corrigan was Hall's employer. Both Mid-States and Corrigan were engaged on a time-and-material basis rather than on a bid basis. ADM supplied the bulk of the materials and coordinated the work among the various crafts; it had the power to stop the work and issue change orders and, in addition, reserved the right to terminate contractors for any reason.

The accident involving Paul Hall occurred at level 714 on one of the steep tanks. The designation 714 refers to the number of feet above sea level and it appears that level 714 was about 35 feet above the ground. A catwalk surrounding level 714 had been erected by Mid-States but was not finished at the time of the accident. The catwalk was necessary to provide ADM personnel with access to valves controlling the pipes at that level. The catwalk was constructed of open steel grating resting upon the supporting steel structure. In order to gain access to level 714, the design plans called for two stairways to be constructed leading up to that level. Thus, there were two holes in the steel grating to accommodate the stairwells. As of July 22, 1981, the date of the accident, the material for the stairwells had not been delivered by ADM's supplier.

Mid-States' general foreman testified that prior to the accident and after the steel grating had been installed, a "sagging" or "deflection" problem developed relative to the catwalk. In order to remedy it, an ADM project engineer authorized Mid-States to reinforce the structural steel supporting the catwalk. This was to be accomplished by the use of scaffolds positioned beneath the catwalk. At the time of the accident the reinforcement work had not been completed and the grating at level 714 had not been welded to the supporting structure.

Considerable evidence was received concerning the opening in the grating and who was to barricade it. Two of ADM's project engineers inspected the steep tank two days before the accident. They noticed that the handrails and stairs leading to level 714 had not been constructed. One of them indicated that the unguarded openings in the catwalk should be roped off and stated that it was his understanding

that the other one would direct Mid-States' personnel to barricade or rope off the openings.

Corrigan's general foreman testified that sometime before the accident he was instructed by ADM's project engineers to begin pipe-fitting work at level 714. One or two days before the accident, he and another Corrigan employee observed the unguarded openings in the catwalk. The foreman instructed the employee to rope off the openings before beginning work on level 714. On the day of the accident, Paul Hall had begun pipe-fitting work on level 714. Another employee had begun roping off the openings but had not reached the one through which Hall fell. There was no eyewitness testimony regarding the fall itself, and Hall did not testify.

The ADM engineer who was to direct Mid-States to barricade the openings testified as to a conversation with Mid-States' general superintendent. He left the conversation with the understanding that Mid-States would either install permanent handrails around the openings or take some temporary measure to safeguard the openings. The Mid-States superintendent testified that he left the conversation with the belief that each of the trades would make the site safe for its own workers and that the area was safe for the steelworkers. He also stated that before any work could be done on safeguarding the openings, ADM would need to authorize additional manpower or the suspension of the reinforcement work to allow Mid-States' employees to do the necessary roping.

Corrigan's union steward in charge of work safety testified that one or two days before the accident, he and Corrigan's general superintendent went to level 714 and observed the unguarded openings. He then contacted Mid-States' union steward to determine whether Mid-States was going to rope off the holes and was informed that Mid-States did not have adequate personnel available to do the job. It was then agreed between Corrigan's steward and its superintendent that part of Corrigan's crew would rope off the openings and the rest would begin moving in equipment. The steward informed the crew members of the arrangement and alerted them to safety factors.

Certain safety experts testified on behalf of ADM. Their testimony and the objections thereto will be discussed later in this opinion. Other facts as necessary to an understanding of the issues raised will be discussed in connection with those issues.

As has been indicated, Hall's conservator, as plaintiff, filed suit against ADM and Mid-States under the Structural Work Act. Her amended complaint sought compensatory damages from both. Later, on the eve of trial and without objection, she filed an additional count

against ADM alleging only wilful and wanton misconduct on the part of ADM and seeking punitive damages.

After service of the original complaint, both ADM and Mid-States filed third-party complaints against Corrigan, Hall's employer, seeking contribution under "An Act in relation to contribution among joint tortfeasors" (Contribution Act) (Ill. Rev. Stat. 1983, ch. 70, par. 301 *et seq.*). ADM also filed a counterclaim against Mid-States for contribution.

Extensive settlement negotiations were conducted involving all parties. A purported agreement was reached to settle plaintiff's claim for $1 million, but the trial court, after an evidentiary hearing, refused to enforce that agreement. Thereafter, a settlement agreement was entered into between the plaintiff, Sarah Hall, conservator, and ADM only. Hall, as conservator, then executed a release which is in words and figures as follows:

"The undersigned, Sarah E. Hall, Conservator of the Estate and person of Paul A. Hall, an incompetent, in consideration of:

1. A payment of One Million, Five Hundred Thousand Dollars ($1,500,000.00) and

2. An agreement by Archer Daniels Midland Company to indemnify and hold harmless Sarah E. Hall, Conservator of the Estate and Person of Paul A. Hall, and her attorneys from all claims upon the above-mentioned cash settlement which are held by, may be held by, or which hereafter may be asserted by Corrigan Company or its insurers with respect to any lien arising from worker's compensation benefits paid to the said conservator or her ward hereby releases and forever discharges Archer Daniels Midland Company, Mid-States General and Mechanical Contracting Corporation, Corrigan Company, the insurers of the aforementioned parties including, but not limited to, United States Fidelity and Guaranty Company, Central National Insurance Company, Home Indemnity Company, Bonger Insurance Company, Optimum Insurance Company of Illinois, Ideal Mutual Insurance Company and the Mission Insurance Company, and the agents, servants, successors, heirs, executors, administrators and assigns, of the aforementioned, and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, damages, costs, attorneys' fees, expenses, claims for worker's compensation benefits, and all claims of any sort or any description which the undersigned or her ward now has or which may in the future accrue on account of or in any way

growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 22nd day of July, 1981 at the Archer Daniels Midland Plant, 4666 Faries Parkway, Decatur, Illinois as a result of which Paul A. Hall was injured.

It is further agreed by the undersigned that this document is specifically intended to release the above-mentioned parties, especially including Corrigan Company and its insurers, from all liability for any future payments to Paul A. Hall, his estate, or his personal representative for benefits which may hereafter accrue under the Illinois Worker's Compensation Act.

It is further understood that the above-stated consideration shall be paid on behalf of Archer Daniels Midland Company and its insurers and that Archer Daniels Midland Company intends to retain and pursue its rights of contribution and indemnity against Mid-States General and Mechanical Contracting Corporation and Corrigan Company (and their insurers) as well as any and all other persons, corporations or other entities released from liability to the undersigned pursuant to this instrument.

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim and that the payment made is not to be construed as an admission of liability on the part of Archer Daniels Midland Company by whom liability is expressly denied, and that Archer Daniels Midland Company intends merely to avoid litigation with the undersigned and to preserve its rights to contribution and indemnity against Corrigan Company and Mid-States General and Mechanical Contracting Corporation.

The undersigned hereby declares and represents that the injuries sustained by Paul A. Hall are or may be permanent and progressive and that recovery therefrom is uncertain and definite and in making this release it is understood and agreed that this release is intended to include all unknown or unanticipated injuries resulting from the above stated accident.

The undersigned further agrees that she will petition the Circuit Court of Randolph County, Arkansas or another appropriate court having jurisdiction of the parties and the subject matter for probate approval of this settlement and that she will recommend to said court that such approval be granted.

The undersigned further agrees to execute whatever docu-

ments are necessary to secure dismissal and satisfaction of the proceedings pending before the Illinois Industrial Commission (Case No. 81 WC 83778).

The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned and that this release contains the entire agreement between the parties hereto and that the terms of this release are contractual and not a mere recital.

The undersigned further states that she has read this Release in its entirety, that she has had the advice and assistance of counsel and that she understands all of the terms of this instrument.''

This settlement was afterwards reduced to judgment, and Hall's complaint against ADM and Mid-States was dismissed with prejudice.

Thereafter, ADM pursued its contribution claims against Mid-States and Corrigan. Both of them filed motions to dismiss. The gist of the motions was that there had been no apportionment in the release between compensatory and punitive damages and therefore it could not be determined whether ADM had paid more than its *pro rata* share of the common liability. Both motions relied on *Houser v. Witt* (1982), 111 Ill. App. 3d 123, 443 N.E.2d 725. After argument, the trial court denied the motions and the cause proceeded to jury trial. The essential evidence has been recited above.

The jury's verdict fixed the percentages of contribution as follows: ADM 12%; Mid-States 48%; Corrigan 40%. The trial court then entered judgment in favor of ADM and against Mid-States in the amount of $788,989 and against Corrigan in the amount of $657,491. These amounts reflected the parties' respective percentages of the $1.5 million settlement plus an amount for a worker's compensation lien. Post-trial motions were denied, and Mid-States and Corrigan bring this appeal.

■■ A principal issue raised by Mid-States and Corrigan (herein for convenience sometimes referred to as defendants in contribution) is that the failure of ADM and Sarah Hall, as conservator, to apportion or allocate the payment made by ADM between compensatory and punitive damages forfends any claim for contribution and that the trial court was in error in denying their motions to dismiss based on that premise. The issue was again raised in the post-trial motions of the defendants in contribution and is therefore properly before this court.

We find that the reliance of the defendants in contribution on *Houser* is misplaced. In that case a husband and wife were injured in

an automobile accident. A settlement was reached and a release executed which was signed by both the husband and the wife. The release did not allocate any amounts to either of them. The husband dismissed his suit for personal injuries. The defendant then amended his answer to allege comparative negligence and filed a counterclaim for contribution against the husband. On trial the husband was found 60% negligent and the defendant 40%. The trial court directed a verdict in favor of the husband on the contribution claim and this court affirmed, holding that lack of allocation in the release between the claims of the husband and the wife made it impossible for the defendant to establish how much he had paid for the wife's claim; therefore, he could not establish that he had paid more than his *pro rata* share as required by the statute.

We find significant difference between *Houser* and the case at bar. In *Houser* there were two ordinary damage claims; each was susceptible of evaluation in terms of dollars; each was based on the ordinary negligence of the defendant. In the instant case there were two claims, but each was based upon a different legal theory; one on the Structural Work Act, and the other on wilful and wanton misconduct. The essence of the latter claim is found in the following allegation:

> "That at the time mentioned above, the Defendant, ARCHER-DANIELS-MIDLAND, did then and there wilfully and wantonly act with a conscious indifference and utter disregard for the safety of workmen involved in the construction of its new facility in that ARCHER-DANIELS-MIDLAND, did require its agents, officers and employees to make unreasonable demands upon the contractors and workmen to complete construction of such facility before permanent stairs and guardrails or other temporary coverings, barricades or devices were erected necessary to protect workmen from injuries or death while performing their duties in the ordinary course of construction."

It is important to note that the amendment adding the count for punitive damages did not incorporate the paragraph in the previous counts which cited the Structural Work Act. It thus appears that plaintiff was pleading, or attempting to plead, a separate and independent cause of action apart from the Structural Work Act.

A cause of action for punitive damages based upon wilful and wanton misconduct is an amorphous creature and exists as a potential in every tort claim. It is beyond dispute that it is generically different from a claim sounding in ordinary negligence. It is not favored in the law and is much less susceptible of measurement than are ordinary

damages.

What is more important is that punitive damages are not subject to contribution. This has been the law in this State since *Farwell v. Becker* (1889), 129 Ill. 261, 21 N.E. 792. Recent developments in the law of contribution have not changed that rule. See *Batteast v. St. Bernard's Hospital* (1985), 134 Ill. App. 3d 843, 480 N.E.2d 1304.

This is the crucial distinction between this case and *Houser*. Here, we have two discrete types of damages with different consequences flowing from each. In *Houser*, the damages were of a single variety, easily susceptible of allocation.

In the instant case, if the defendants in contribution desired allocation, it was their burden to raise the issue properly. As has been indicated, they filed motions to dismiss, an all-or-none approach. Upon denial of those motions, the proper approach would have been to raise the question by an affirmative pleading and submit it to the jury for resolution as a factual question. This should be done even if an allocation has been made in the settlement agreement itself because of the potential for collusion. If ordinary and punitive damages are to be allocated in the settlement, the settling defendant will be strongly motivated to allocate as much as possible on compensatory damages for which he can obtain contribution. A plaintiff may agree to a larger amount of total damages in return for his agreement to pile the bulk of them on compensatory. Allocation at root is a good faith question under the Contribution Act and should be settled by a jury.

Good faith was a question in *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792, and it was settled by the trial court without the intervention of the jury. However, this was done apparently by agreement of counsel because the point was not raised in that case.

■ The trial court did not err in denying the motions to dismiss. The defendants in contribution failed to follow through by raising the same question by an affirmative pleading and cannot now be heard to complain about allocation of damages.

■ A more troublesome question concerns the impact of Corrigan's liability to Paul Hall under the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, pars. 138.1 through 138.30).

Section 2(e) of the Contribution Act (Ill Rev. Stat. 1983, ch. 70, par. 302(e)) provides: "A tortfeasor who settles with a claimant pursuant to paragraph (c) is not entitled to recover contribution from another tortfeasor whose liability is not extinguished by the settlement." The release set forth above provides that the plaintiff, Sarah Hall, conservator, would "execute whatever documents are necessary to se-

cure dismissal and satisfaction of the proceedings pending before the Illinois Industrial Commission." The record is devoid of any evidence that such proceedings have been dismissed and satisfied.

Moreover, the release is totally ineffective to accomplish such a result in the absence of approval by the Commission. Section 23 of the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.23) provides in relevant part:

> "No employee, personal representative, or beneficiary shall have power to waive any of the provisions of this Act in regard to the amount of compensation which may be payable to such employee, personal representative or beneficiary hereunder except after approval by the Commission."

ADM filed a motion for entry of judgment following the trial in which it was recited that the total amount of the workers' compensation lien was $143,728.54 and the trial court apparently used this figure in assessing the contribution amounts of Mid-States and Corrigan. That figure may have been accurate at the time, but lacking approval of the settlement by the Commission, it cannot be deemed final. Approval of a settlement is not a required ministerial act of the Commission but is a discretionary function of the Commission. *People ex rel. PPG Industries, Inc. v. Schneiderman* (1980), 92 Ill. App. 3d 546, 414 N.E.2d 1950.

ADM has argued that the liability under the Workers' Compensation Act is not "liability in tort" within the meaning of the Contribution Act. In *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 14, 461 N.E.2d 382, 388, the supreme court stated that "the Contribution Act focuses, as it was intended to do, on the culpability of the parties rather than on the precise legal means by which the plaintiff is ultimately able to make each defendant compensate him for his loss." Consistent with this rationale, a settling tortfeasor must extinguish the liability of joint tortfeasors for workers' compensation benefits prior to seeking contribution.

It thus appears plain that Corrigan's liability under the Workers' Compensation Act was not extinguished by the settlement agreement. We note a significant portion of section 5(b) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.5(b)) dealing with actions brought by the employee against third parties. where such actions are brought and a settlement reached between the employee and the third party, the Act provides:

> "No release or settlement of claim for damages by reason of such injury or death, and no satisfaction of judgment in such proceedings shall be valid without the written consent of both

employer and employee or his personal representative, except in the case of the employers, such consent is not required where the employer has been fully indemnified or protected by Court order."

In the case at bar, Corrigan did not consent to the settlement, and there is no order in the record which can be interpreted as fully indemnifying and protecting Corrigan. It therefore follows that the order of the trial court is erroneous as regards Corrigan.

As to Mid-States, it was not Hall's employer and therefore did not hold a lien for workers' compensation payments made to him. However, under the particular facts of this case a reversal as to Corrigan requires reversal also as to Mid-States. In *Laue v. Leifheit* (1984), 105 Ill. 2d 191, 473 N.E.2d 939, the supreme court stated that the public policy of this State is to avoid a multiplicity of suits in contribution actions. To retry the action as to Corrigan without Mid-States could lead to inconsistent verdicts, a situation condemned by the supreme court in *Laue*. Mid-State's presence at retrial will serve the rationale of *Laue*.

Since Corrigan's liability was not extinguished and since Mid-States is a necessary party on retrial, the contribution judgments must be reversed and remanded for further proceedings.

The remaining issues raised by the defendants in contribution may be disposed of more summarily.

They first argue that ADM failed to make out a *prima facie* case for contribution by establishing that the settlement was arrived at in good faith and that the amount was reasonable. This question was first raised in the post-trial motions of the defendants in contribution, but was not specifically ruled upon by the trial court in its letter explaining its reasons for denying those motions. The defendants in contribution cite no authority for the proposition that good faith is an element of a *prima facie* case in contribution.

The cases are not uniform in their holdings as to how the issue of good faith should be handled. Some say that it may be decided on the basis of arguments of counsel (*Perez v. Espinoza* (1985), 137 Ill. App. 3d 762, 484 N.E.2d 1232; *Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 478 N.E.2d 581.) Others have held that the trial court may rule on the basis of discovery materials and other pleadings in the file. (*Lowe v. Norfolk & Western Ry. Co.* (1984) 124 Ill. App. 3d 80, 463 N.E.2d 792.) The *Lowe* court indicated a strong preference for a hearing with which we agree, since good faith is essentially a matter of fact.

In our opinion, raising the question of good faith in a post-trial

motion comes too late. The defendants in contribution filed motions attacking the allocation issue as has been described above. No motion or other pleading relating to the issue of good faith was presented until after the trial was over. Had it been raised during trial, or pretrial, the trial court could have made an appropriate disposition by either submitting the question to the jury or by agreement of counsel considering the question himself.

The argument concerning good faith is without merit.

■■ The next issue concerns the jury's allocation of fault and its derivative percentages of contribution. The defendants in contribution argue that the verdict is against the manifest weight of the evidence. It would serve no good purpose to reiterate the evidence set forth above. It seems clear that ADM's control of the work was more remote than that of Mid-States or Corrigan; hence, the smaller percentage allocated to it.

The evidence showed that the supervisory personnel of each party was aware of the hazard presented by the unguarded openings at level 714 but none took measures to remedy the situation. Mid-States was responsible for creating the danger, and the jury would properly have found that it had knowledge that Corrigan employees would be exposed to the danger when they went to work at level 714 on the day of the accident. Corrigan employees also had knowledge of the danger but nevertheless sent Paul Hall to work at level 714 before the openings could be barricaded. We find no basis upon which to overturn the verdict.

■■ The next issue concerns the admission of the testimony of two expert witnesses presented by ADM. Both had their expertise in the field of industrial safety. Lindsey Hayes was a safety consultant with 25 years' experience, including two years with the United States Occupational Safety and Health Administration (OSHA).

Hayes testified that under OSHA regulation No. 1925.500, entitled "Floor and Wall Openings and Stairways," an employer is required to temporarily guard floor openings with covers or railings around the openings 42 inches above floor level. Hayes stated that the above measures are applicable to the employer who creates the hazard and to any employer whose employees are exposed to that hazard, in this case Mid-States and Corrigan. It was Hayes' opinion that ADM had no duty under OSHA regulations to barricade the hole through which Paul Hall fell. At one point Hayes testified without objection that Mid-States and Corrigan were in direct violation of the above OSHA regulations. Thereafter, Hayes was asked directly whether Mid-States and Corrigan were in violation of OSHA regulations at the

time of the accident and was allowed to testify over defendants' objections that they were.

Hayes also testified that standards set forth by the American National Standards Institute (ANSI) applied to the structural steelwork being done by Mid-States at the time of the accident. Under ANSI standards, an employer engaged in steel erection is required to survey safety conditions at the work site to determine if there are any hazards such as unguarded floor openings. Such openings must be covered or barricaded until such time as they are used. If an employee is required to work around an unguarded opening, he must be provided with a safety belt and lanyard securely anchored. Hayes testified over objection that no ANSI standard excused compliance where, in the employer's opinion, there is insufficient manpower to comply with the standards. In Hayes' opinion, it would have taken one or two men from 20 to 30 minutes to rope off the hole using steel rope and about 15 minutes using hemp rope, excluding the time necessary to obtain the material.

On cross-examination Hayes testified that the OSHA regulations did not apply to Mid-States insofar as Corrigan employees were concerned since the regulations were directed at only the immediate employer. However, Hayes stated that had a safety inspection been made of level 714 prior to the accident, both employers would have been cited for OSHA violations. Hayes stated that ADM would have violated OSHA by exposing any of its own employees to the hazards at level 714. Hayes' opinion, based upon the materials he reviewed, was that ADM was not acting as a general contractor on the steep tank project and was not totally responsible for the scheduling of the work by various trades.

ADM also called Harold White, a safety and teaching consultant who had also been previously employed by OSHA. White had been retained by counsel for Mid-States to investigate the accident involving Paul Hall and had reviewed depositions and other materials concerning the case. White testified that the custom and practice in the construction industry is that each employer makes the work area safe for its own employees. In White's opinion, Corrigan should have inspected level 714 and barricaded the holes prior to sending its employees up to work there, pursuant to OSHA regulations. White stated his opinion that ADM also violated OSHA since it also had employees exposed to the hazards at level 714 and since it could have directed the contractors to stay off of that level until the hazards were safeguarded. White testified that Mid-States also had employees exposed to the danger of the unguarded holes. ADM was not in a po-

sition to provide guardrails for the openings. However, ADM should have insured that one of the contractors on the job guarded the holes, and in failing to do so violated OSHA regulations. White acknowledged stating at his deposition that ADM was not required to stand by the work site until the holes were barricaded. White stated that in some circumstances an employer has an obligation to make a work site safe for employees other than its own.

On cross-examination, White indicated that it ws not customary for other trades to work in an area where the floor is not completed. White stated that in order for a violation of OSHA regulations to occur with relation to a hazard, workers must be exposed to the hazard by working at or near it. No violation would occur if employees were working below level 714 since they would not be exposed to the unguarded openings. Further, no violation would occur if employees working around the hole were equipped with safety belts and lanyards. White stated that there would be no OSHA violation if Corrigan had sent employees up to level 714 solely to rope off the holes and an employee fell through the hole while attempting to barricade it. However, if a Corrigan employee was sent to level 714 to do other work before the area was made secure, there would be an OSHA violation.

White testified that there is one set of OSHA standards applicable during the construction phase and one set of standards applicable after a floor is completed. In White's opinion, the "steel erection standards" applied at the time of the accident since the floor was still under construction. White indicated that there was no OSHA section requiring covering or barricading of holes in floors under construction. White opined that Mid-States did not violate the OSHA steel erection standards.

The objection to the testimony is largely directed at Hayes and his statement that both Mid-States and Corrigan were in direct violation of OSHA regulations at the time of the accident. The contribution defendants concede that evidence of OSHA regulations as applied to a particular construction project is admissible on the issue of whether a scaffold is in an unsafe condition. (*LePage v. Walsh Construction Co.* (1984), 126 Ill. App. 3d 1075, 468 N.E.2d 509.) However, they argue that it was error for Hayes to testify that they violated a duty to Paul Hall under OSHA regulations. The gist of the argument seems to be that an expert can testify about a safety standard under OSHA regulations but cannot testify that specific defendants violated that standard.

Earlier case law held that lay or expert witnesses could not tes-

tify on an ultimate issue. More modern decisions take the contrary view. (See *Perschall v. Metropolitan Life Insurance Co.* (1983), 113 Ill. App. 3d 233, 446 N.E.2d 570.) The later concept is that an expert may express an opinion which embraces the ultimate issue in the case so long as the opinion will assist the trier of fact in understanding the evidence or determining a fact in issue. (E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 704.1, at 478—79 (4th ed. 1984).) Hayes' opinion meets this test. No error occurred.

The contribution defendants next argue that the trial court erred in refusing to enforce a settlement purportedly reached by the parties in August 1984. As has been stated above, there were extensive settlement negotiations and one for $1 million was submitted to the trial court which held extensive hearings on the matter and on October 7, 1984, refused to enforce it. Thereafter, the $1.5 million settlement involved in the instant case was reached and the trial court did enforce it. It was reduced to judgment, and Sarah Hall, as conservator, dismissed her suit with prejudice as to all defendants. The trial court made a finding under Supreme Court Rule 304(a) (103 Ill. 2d R. 304(a)) as part of the judgment order.

ADM has argued that the failure of the defendants to take an appeal from that order deprives this court of jurisdiction to entertain the issue. We do not agree. The judgment order, dated January 7, 1985, was in effect a consent judgment, and in any event was final as to all parties on the structural work claim. It was not prejudicial to Mid-States and Corrigan, and those parties should not be required to appeal from a judgment in their favor. The issue was preserved in the post-trial motions of the contribution defendants.

As to the merits, the trial court heard extensive evidence and held that there was no settlement in August 1984. There was no written release or other document containing any terms of settlement. There was evidence of offers and counteroffers made by both sides, but no evidence that Sarah Hall, conservator, ever accepted the $1 million settlement.

Plaintiff Hall maintained that she could not accept a settlement until it had been approved by a probate court in Arkansas which had previously appointed her conservator of Paul Hall. This contention was rejected by the trial court, although there is case authority supporting plaintiff's position. (See *Mastroianni v. Curtis* (1979), 78 Ill. App. 3d 97, 397 N.E.2d 56; *Vece v. De Biase* (1964), 46 Ill. App. 2d 248, 197 N.E.2d 79.) However, plaintiff's position is indicative of her state of mind and is evidence that no meeting of the minds over the settlement occurred. The *Vece* court noted that oral settlements in

tort cases are not considered final and enforceable until the case has been disposed of and releases have been signed; until that time either party may change its mind.

■■ The refusal of the trial court to enforce the purported settlement of August 1984 was not against the manifest weight of the evidence.

■■ The final contention is made by Mid-States only. It maintains that the inclusion of the 25% attorney fees in the workers' compensation lien which was added to the $1.5 million judgment has caused it to pay more than its *pro rata* share of the judgment. The record contains an assignment of these fees from plaintiff's attorneys to ADM. ADM argues that only Corrigan can complain about the inclusion. We do not agree. As we have stated above, Mid-States is a necessary party to the retrial which will include calculations concerning not only the compensation lien but also the fees in connection therewith.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is reversed and the cause is remanded to that court for further proceedings in accordance with the views expressed in this opinion.

Reversed and remanded.

GREEN and SPITZ, JJ., concur.