**RANGER INSURANCE COMPANY, Plaintiff,**

v.

**HOME INDEMNITY COMPANY, Defendant.**

No. 88 C 05180.

United States District Court,
N.D. Illinois, E.D.

May 29, 1990.

Robert Chemers, Pretzel Stouffer, Chicago, Ill., for plaintiff.

John D. Kuhn, Brinton & Fedota, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This matter is presently before us for decision following a bench trial we conducted on Counts II and III of the plaintiff's complaint.[1] These claims were brought by an excess insurance carrier, Ranger Insurance Company ("Ranger"), against a primary carrier, Home Indemnity Company ("Home"), seeking to hold Home liable for allegedly acting negligently or in bad faith in refusing to settle a tort claim within Home's policy limits on behalf of their mutual insured, Mid–States General & Mechanical Contracting Corp. ("Mid–States"),

thereby unreasonably requiring Ranger to pay for the amount of a jury verdict in excess of Home's primary limits.

## I. Home's Motion for a Directed Verdict

We first consider Home's motion for directed verdict alleging that Ranger has failed to establish evidence in its case in chief sufficient to make out a prima facie case of liability against Home based on Home's alleged negligence or bad faith. We find, however, that Ranger has presented sufficient evidence to establish a prima facie case. We therefore consider the weight of the evidence. Having reviewed all of the testimony, exhibits, and stipulations of the parties, and for the reasons stated in these findings and conclusions, we enter judgment in favor of Home on Counts II and III.

## II. Background Findings of Fact

The following findings of fact are based on undisputed evidence and provide background for the further findings of fact and conclusions of law in Section III.

Ranger is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business in Houston, Texas, and is engaged in the business of insurance. Home is a corporation organized and existing under the laws of the State of New Hampshire, maintains its principal place of business in New York and is engaged in the business of insurance.

Ranger issued its policy of insurance numbered RU453597 to Mid–States as named insured. That policy provided for commercial umbrella liability insurance. Home issued its policy of insurance numbered GL1149456 to Mid–States as named insured. That policy provided for comprehensive general liability insurance on a primary basis with an effective policy period from May 31, 1981 to May 31, 1982, with a liability limit of $500,000 per occurrence.

In 1983, Sarah E. Hall, as Conservator of the Estate and Person of Paul A. Hall,

---

1. Our opinion in *Ranger Insurance Co. v. Home Indemnity Co.,* 714 F.Supp. 956 (N.D.Ill.1989) resolved the parties cross-motions for summary judgment, resulting in summary judgment in favor of the plaintiff on Count I of its complaint, and dismissal of the defendants counterclaim.

brought suit under the Illinois Structural Work Act, Ill.Rev.Stats., ch. 48, ¶ 60 *et seq.*, against Mid–States and Archer–Daniels–Midland ("ADM") seeking damages for personal injuries allegedly suffered by Paul A. Hall on July 22, 1981, when he fell through a catwalk at ADM's plant in Decatur, Illinois, while in the employ of Corrigan Company ("Corrigan"). Corrigan was engaged in pipefitting for an expansion project at ADM's facility. Suit was filed under case No. 83 L 232 in the Circuit Court of Sangamon County, Illinois.

ADM eventually settled the entire case with Hall for $1,500,000, plus indemnity for the payment of the outstanding worker's compensation lien. ADM then pursued a contribution claim against Mid–States and Corrigan before a jury, which determined the parties' share of contribution on January 17, 1985. Mid–States was determined to have been 48% liable and a final judgment was entered in favor of ADM and against Mid–States for $788,989 on January 29, 1985.

The Appellate Court of Illinois, 4th District, reversed the judgment of the trial court on April 7, 1986. The decision is reported at 142 Ill.App.3d 200, 96 Ill.Dec. 600, 491 N.E.2d 879. The Supreme Court of Illinois on May 18, 1988 reversed the Appellate Court and reinstated the judgment entered on the jury's verdict. That decision is reported at 122 Ill.2d 448, 120 Ill.Dec. 556, 524 N.E.2d 586.

On June 1, 1988, Ranger paid $288,989 to ADM, which equalled the amount of the judgment in excess of the Home policy limit.

The persons involved in this litigation are as follows. Barry Montgomery was counsel for ADM, Grady Holley was counsel for Mid–States and Rick Velde was counsel for Corrigan. Paul Patton was Home's claims

supervisor on the Mid–States file. Jack Connaughton was the person handling the Mid–States file for Ranger.

### III. Findings of Fact and Conclusions of Law

#### A. General Standard of Liability

■ Illinois law governs this action. As we have held previously, Home as the primary carrier owed a direct duty to Ranger, the excess carrier, to attempt to settle the action against the insured within its primary coverage limit. *Ranger Insurance Co. v. Home Indemnity Co.*, 714 F.Supp. 956, 960, 963 (N.D.Ill.1989). A primary insurer, however, is not obligated under Illinois law to initiate settlement negotiations. *Kavanaugh v. Interstate Fire & Casualty Co.*, 35 Ill.App.3d 350, 342 N.E.2d 116 (1st Dist.1975). Thus, for a primary insurer to be found liable for negligent or bad faith refusal to settle, an excess carrier must prove that the judgment creditor offered terms of settlement within the policy coverage, and there was a real possibility of an adverse judgment greater than the coverage limit such that the failure to settle should be deemed negligent or to have occurred in bad faith. *See id.* at 962.[2]

#### B. Proximate Cause

■ Since the damages in this case are based on Ranger having to pay on a judgment in excess of Home's limits, the issue of proximate cause is one of the elements which Ranger must establish in order to prevail. Thus, before making any finding on the issue of bad faith or negligence toward the interest of Ranger, we must consider whether this matter actually could have settled prior to verdict within Home's policy limits.

In order to prevail on this issue Ranger must have shown that the judgment creditor offered terms of settlement (i.e. a de-

---

**2.** According to an unsupported statement by Home, Ranger's burden of proof in this case is the preponderance of the evidence standard. *See* Home's "Legal Contentions" at ¶ 6. Thus, any question that the burden of proof might be higher, particularly in the subjective determination of bad faith, is not before us. We further note that since the finding of a duty running from a primary to an excess carrier is a fairly recent development in Illinois, most of the applicable legal principles are "borrowed" by analogy to the well established doctrine concerning a primary insurer's obligations to its insured. *Cf. Ranger I*, 714 F.Supp. at 961 (indicating that, with respect to an excess carrier, primary carrier should be held to the same standard of care already owed to the insured).

mand) within the policy coverage. *Ranger*, at 962. Presumably, if the judgment creditor made a demand to settle such that Mid–States could get out of the case prior to verdict for an amount within Home's policy limits, then proximate cause has been established. In deciding this issue, we conclude that Ranger did not have to show that an individual settlement demand was made upon Mid–States for an amount within Home's limits. Proximate cause may be shown if the other defendants had committed to making definite contributions towards a judgment creditor's general demand, and the remainder of the demand could then have been fully met had Home authorized an amount within its policy limits on behalf of Mid–States.

### 1) Settlement Demands by Judgment Creditor

In their post-trial papers, the parties dispute whether the evidence establishes that the judgment creditor—either the tort plaintiff, or later, ADM—offered terms of settlement which an offer from Mid–State's within Home's policy limits would have met. For the purposes of considering this disputed issue, we have divided the time prior to the verdict in this case into four distinct periods during which settlement activity either took place or might reasonably have taken place.

The first serious settlement activity occurred during pretrial discussions in August 1984 when ADM, Home, and Corrigan were still aligned as defendants and working together to jointly meet what began as a 1.8 million dollar demand proposed by the tort plaintiff. During these negotiations, Home ultimately authorized a contribution, within its limits, to the total settlement package that was put together by Mid–States, Corrigan and ADM to meet what the parties believed was a firm and enforceable offer to settle by the tort plaintiff's counsel for approximately $1,000,000. It was the tort plaintiff who later rejected the settlement agreement.[3] During the period leading up to the rejection of the set-

tlement the tort plaintiff made no other offers of settlement that would have settled the case against Mid–States within Home's limits.

The second period of possible settlement extended from the time the tort plaintiff rejected the August 1984 settlement until December 5, 1984 when the tort plaintiff reached a separate agreement to settle the entire action only with ADM.[4] During this period, the tort plaintiff directed no further offers either individually or jointly to Mid–States. Nor did the tort plaintiff give Mid–States any opportunity to contribute to the settlement agreement she had reached with ADM.

The third period began once ADM settled the case with the tort plaintiff and became the judgment creditor with respect to its contribution action against Mid–States and Corrigan. Ranger contends that the evidence shows that during this period Montgomery had proposed a firm offer of settlement on behalf of ADM, asking each party to pay one-third of the settlement. According to Home, ADM made no firm demands on Mid–States prior to or during the trial in the contribution action. Home states that any discussions concerning a one-third split were merely "talk" and never put into the form of a serious or definite demand. Home's argument has some merit insofar as the evidence does not undisputably establish that Montgomery had authority to settle the case based on a one-third apportionment among the parties—a matter we address below. Nevertheless, even assuming that the one-third proposal was a firm demand, we find such a demand against Mid–States would not have resulted in a settlement within Home's $500,000 policy limit. It is undisputed that the settlement between ADM and the tort plaintiff was for $1,500,000 plus indemnity for the payment of the outstanding worker's compensation lien. And the parties further agree that the amount of the lien was approximately $150,000. That makes the total figure for the settlement to be approximately

---

**3.** The subsequent attempt by the defendants to enforce the agreement proved unavailing.

**4.** The court did not finally approve that settlement agreement until shortly before the trial began in January 1985.

$1,650,000. Dividing that total by one-third, the alleged demand against Mid–States exceeded the amount of primary coverage by approximately $50,000. Therefore, even though Velde, the attorney for Corrigan, may have had authority to enter into a settlement with ADM for the one-third figure of $550,000 (on the condition that his client would then receive credit for its worker's compensation lien), the terms of settlement offered by ADM could not have been fully met by an offer within Home's policy limits. Thus, here too, Ranger has failed to establish that ADM made an offer of settlement that would have settled the case within Home's limits.

That was the way matters stood until several days into the trial, which brings us to the fourth period of settlement opportunity. In a letter to Patton, dated January 10, 1985, Connaughton wrote that he understood that Corrigan was willing to pay the one-third allegedly demanded of it by ADM and that left only the one-third demanded from Mid–States. Connaughton then indicated that if the case could not settle within Home's limits then Ranger was willing to contribute the additional $50,000 needed to meet the demand. (Exhibit 28). Patton received that letter on January 11, 1985 and sent a copy on to the home office in New York the same day. (Tr. at 76). The jury did not return its verdict in the case until January 17, 1985. (Exhibit 46). Thus, if the $50,000 offered by Ranger was combined with the one-third share that Corrigan was willing to pay, then for a period of several days prior to verdict Home faced a situation in which the remaining portion of a demand could have been satisfied within its policy limits.[5] Therefore, at least during this final period, assuming the demand was firm, proximate cause has been shown.

### 2) The Firmness of Montgomery's Proposal

We now address whether Montgomery's proposal of a one-third split was in fact a serious offer of settlement. In other words, we consider whether Ranger has shown by a preponderance of the evidence that the tender by Mid–States and Corrigan of one-third each of the settlement actually would have been accepted by ADM, or whether Montgomery's proposal was merely "talk," as Home suggests.

In support of its contention that ADM had made a firm demand for settlement, Ranger points to numerous references in Patton's testimony and in Home's correspondence and notes indicating that Home was clearly aware of Montgomery's one-third proposal. (Tr. at 80–83; Exs. 9, 12, 29). Ranger further relies on the testimony of Velde who indicated that ADM made a "demand" that each party pay one-third of the settlement and lien. (Tr. at 126–27). It is not disputed, however, that even prior to ADM taking over the case, Montgomery had consistently maintained that a one-third split was the way Montgomery wanted to see the case settled.

We are concerned, however, with the question as to whether the satisfaction of the proposal actually would have resulted in the case settling. Ranger's evidence does not directly establish that Montgomery's opinion concerning how he wanted to see the case settled constituted a firm demand authorized by, and made on behalf of, ADM and its insurers. Of course, the fact that Montgomery maintained the one-third proposal for a period of several weeks circumstantially creates the inference that he had underlying authority for making the proposal.

In its defense, however, Home has presented persuasive evidence refuting such an inference regarding Montgomery's authority. According to Holley, during the contribution trial, Montgomery had indicated that "he didn't necessarily have authority for anything, but that he would not go to anybody with anything less than one-third." Tr. at 167, 174–75. Holley regarded that statement, not as a binding offer, but simply as a suggestion that if he came up with the one-third figure (along with

---

**5.** We see no reason why Ranger's offered contribution should not be combined for the purpose of ascertaining proximate cause.

Corrigan) then Montgomery would see if ADM would take it. Thus, although the one-third proposal had been made, if Holley's recollection was correct, not only was the demand not firm, but it was also not at all certain that Montgomery's client would ultimately approve such a proposal.

Evidence in the form of Edward Murphy's testimony corroborates that the one-third proposal was not authorized and further indicates that a settlement based on one-third contributions was not likely to have been accepted by ADM or its insurers. Murphy, who appeared as a witness in Home's defense, was the associate in Montgomery's firm assigned to the file from the time it came into the office through the time it went up on appeal.[6] Tr. at 198. Murphy was the person who would have cleared any settlement proposals with ADM and its carriers. Tr. at 209. Murphy testified that ADM never made a clear, firm offer to Mid–States that would have settled the case against Mid–States before verdict in the trial. Tr. at 198. In fact, Murphy was completely unaware of Montgomery's one-third proposal to Mid–States and Corrigan, even though Murphy was assisting Montgomery and present during the entire trial. Tr. at 208. Had the one-third proposal been a firm and authorized offer of settlement we find it likely that Murphy would have known about it.

Murphy further identified several reasons why a firm offer was not made and why it was unlikely that the case would have settled with Mid–States, prior to verdict, for a figure within Home's $500,000 policy limits. Murphy first stated that as far as he knew the option of settling the case with Mid–States or Corrigan individually was never considered. Tr. at 199.[7] Murphy then identified an obstacle to ADM wanting to settle with Mid–States and Corrigan combined for any amount less than the full $1,500,000 (not counting the workers compensation lien). Prior to ADM settling the case with the tort plaintiff, ADM's primary carrier, Optimum Insurance Co. had gone into receivership. Consequently, of the $1,500,000 paid to settle the case with the tort plaintiff, ADM's excess carrier had put up $1,000,000; ADM had paid the primary balance of $500,000 from its own corporate funds and remained additionally liable under a hold harmless agreement for the amount of any workers compensation lien which would be asserted by Corrigan or its carriers. Because the excess carrier was entitled to the first dollar of any settlement or recovery, Murphy stated that ADM therefore had nothing directly to gain from a one-third split. Tr. at 199. This testimony suggests, and we find it likely that because ADM might have had a problem ultimately recovering money from its primary carrier on the amount it had paid out, ADM had every incentive to take the chance of obtaining at trial more than the two-thirds combined percentage from Mid–States and Corrigan in order to offset its own direct liability of greater than $500,000.[8]

---

6. Murphy is now a partner in that firm. In addition, we note that we take into account the fact that Home is one of the firm's clients and the firm has done a substantial amount of business over the years for Home and its insurers. Tr. at 204–05, 239.

7. We do not view this as an obstacle to settlement, since Corrigan had come up with the one-third necessary to meet the proposal. Perhaps it explains, however, why Montgomery never settled with Corrigan even though Montgomery apparently was told by Velde that he had the authority to settle the case against Corrigan for the one-third and a waiver of the lien. Tr. at 130.

8. This finding, based on the credible testimony of one of ADM's own lawyers, is not contradict-ed by the testimony of Velde, Corrigan's attorney, who indicated that ADM was prepared to pay $550,000 out of its own monies. (Tr. at 127). The fact that ADM was prepared to pay $550,000 out of its own monies does not mean that ADM necessarily wanted to pay that amount if it could be avoided. Indeed, in some of the same notes written by Patton and to which Ranger refers as evidence of the one-third proposal, Patton indicates, just prior to the trial of the contribution action, that Montgomery "wants to go to verdict—no matter what." Ex. 29.

In addition, this finding is supported by the fact that Montgomery apparently refused to accept Corrigan's individual tender of one-third. Had Corrigan's one-third been accepted, then ADM's chances of offsetting its own payment would have been reduced, since only one defen-

Furthermore, because the primary carrier for ADM was in receivership, Montgomery was in an unusual position with respect to the source of his authority, which posed a conflict of interest that in turn created an additional obstacle to engaging in serious settlement negotiations. Montgomery had to juggle ADM's interest with that of the people at the guarantee fund for ADM's primary carrier. According to Holley, "it was going to be difficult to do much in terms of settlement because it was clear from what Mr. Montgomery said that he didn't really have anyone to talk to as far as that first layer of insurance was concerned." Tr. at 152.[9]

In light of all of these factors, we find that the greater weight of the evidence supports the conclusion that Montgomery's one-third proposal did not constitute a firm offer of settlement. Ranger therefore has failed to establish that either judgment creditor made a firm demand against Mid–States that would have resulted in an enforceable settlement agreement for an amount within Home's policy limits.

### 3) The Duty to Initiate Negotiations in the Absence of a Firm Offer

█ Anticipating the possibility that we might find that a firm offer to settle within policy limits was not made, Ranger nevertheless proposes we should apply the recognized exception to the general rule that an insurer ordinarily has no obligation to initiate negotiations. Ranger contends that circumstances of this case obligated Home to initiate negotiations "because the

probability of an adverse finding of liability was considerable, and there was a possibility that the amount of probable damage would exceed coverage." We initially observe that Ranger has misstated the standard clearly enunciated in the cases upon which it relies for this proposition. *See Adduci v. Vigilant Insurance Co.*, 98 Ill. App.3d 472, 53 Ill.Dec. 854, 424 N.E.2d 645, 649 (1981), and *Cernocky v. Indemnity Insurance Company of North America*, 69 Ill.App.2d 196, 216 N.E.2d 198, 205 (1966). Under Illinois law the exception is properly to be applied when the probability of an adverse finding on liability is considerable and the "amount of probable damages would *greatly exceed the insured's coverage." See Adduci*, 424 N.E.2d at 649; *Kavanaugh*, 342 N.E.2d at 121. (emphasis added). Further, the exception "should be sparingly used, and then only in the most glaring cases of an insured's liability, since trial attorneys are not endowed with the gift of prophecy so as to be able to predict the precise outcome of personal injury litigation." *Adduci*, 424 N.E.2d at 858–59; *Kavanaugh*, 342 N.E.2d at 121.

Ostensibly, the exception directly affects the scope of a primary insurer's duty—by broadening it. Yet, even assuming that circumstances would have required Home to initiate negotiations to attempt to settle the case within its limits, the threshold issue of proximate cause remains. The exception implicitly bears upon that issue, since it makes available for consideration the possibility that settlement overtures by

---

dant, Mid–States, would have remained in the contribution action.

**9.** In addition, it is Home's position that, by holding fast at wanting nothing less than a full one-third from each party, Montgomery may have been attempting to stave off a conflict with respect to the excess carrier, by seeking at the very least to recoup the entire amount of the money the excess carrier had paid toward settlement with the tort plaintiff. (Although there apparently would have remained the $50,000 share of the workers compensation lien; whether that money would have to be paid out of the excess carrier's funds or ADM's is not certain). On the other hand, we are aware that by taking the case to trial, Montgomery was also subjecting ADM's excess carrier to the possibility of a contribution verdict imposing an adverse pro-

portion of fault on ADM such that the excess carrier might ultimately have been exposed to an even greater extent. Because these considerations were not adequately developed at trial, it is difficult for us to factor in how the potential for conflict with the excess carrier may have affected settlement opportunities. Accordingly we give this aspect no weight in our determination.

We additionally note that Ranger has made much of that assertion that ADM's settlement with the plaintiff may have altered the potential apportionment of fault in favor of ADM. To the extent that assertion is true, it would cut against the possibility that a settlement within policy limits could have been effected, since the incentive to obtain a higher settlement figure would have been even greater.

the primary insurer (as opposed to the judgment creditor) offering terms within its limits would have resulted in the case settling.

Nevertheless, proving proximate cause in circumstances in which the exception applies presents some difficulties, which in this case, are insurmountable. As we have earlier indicated, a firm offer from a judgment creditor to settle within a primary insurer's policy limits is essentially presumptive on the issue of proximate cause, since it is assumed that if the primary insurer tendered the amount that the judgment creditor has indicated would settle the case, then the case would have settled. Under the exception, however, the plaintiff must affirmatively show that had the primary insurer offered terms of settlement within its limits, the judgment creditor, who had not otherwise so indicated, would ultimately have accepted the offer.[10] Yet, paradoxically, although the exception may benefit an excess carrier's bad faith action by expanding the scope of the primary carrier's obligations to pursue settlement, it works to the detriment of the excess carrier on the issue of proximate cause. Since the exception applies only where the probability of an adverse finding of liability is considerable and the amount of probable damages greatly exceeds primary coverage, the likelihood that a settlement offer within primary limits would be acceptable to a judgment creditor would necessarily be drastically reduced. That fact leads us to question the efficacy of the exception in providing relief in the extreme case.

Notwithstanding that problem of application, even if we assume that the circumstances in this case would have obligated Home to initiate settlement offers within its limits, we find that Ranger has failed sufficiently to establish that even an offer from Home of its limit of $500,000 would have been accepted by either the tort plaintiff or ADM. This finding is based on many of the considerations we have already discussed.

During the first settlement phase we have identified, it was the plaintiff who ultimately rejected the settlement package that the defendants had put together which involved a contribution from Home within its limits. Regarding the second phase, which immediately followed the rejection of the settlement package, Ranger has failed to adduce any positive evidence that an offer of Home's limits, either as an individual offer or as part of a joint package, would have been favorably entertained by the tort plaintiff. What we know during this period is that the amount that the tort plaintiff wanted from all of the defendants to settle the case was $1,650,000, as reflected by its settlement with ADM. That figure clearly exceeds Home's policy limits. Further, the evidence is undisputed that the tort plaintiff's attorney would not consider any individual offers to settle only a portion of the case against a particular defendant. Tr. 142–145, 164. Indeed, there is evidence that Holley had tried to get the tort plaintiff's attorney to hold off settling with ADM so that he could pursue negotiations separately and then the plaintiff could preserve his cause of action against ADM. Ex. 11. The plaintiff refused. Finally, although Home conceivably could have offered its limits to ADM as a contribution towards ADM's settlement with the tort plaintiff, there is absolutely no evidence tending to show that $500,000 would have been acceptable to ADM at that time. In fact, the evidence suggests that ADM clearly wanted to exclude Mid–States and Corrigan from the settlement, finding it more advantageous to proceed as plaintiff against those two defendants in the contribution action. Regarding the third and fourth phases of settlement, we have already discussed at length why the evidence has failed to show that, even if Home had initiated an offer of its $500,000 policy limits—or later, $550,000 including the amount Ranger was willing to contribute—that ADM would have accepted the offer.

---

**10.** We note that since the exception applies in the absence of a firm offer of settlement within policy limits from the judgment creditor, the obligation imposed by the exception logically would arise both when a firm offer was made, but which exceeded policy limits, and when there has been no firm offer.

Ranger has provided no evidence other than Montgomery's proposal, which we have discounted, regarding the position that ADM or the guarantee fund for ADM's primary carrier might have had with respect to settlement. In the absence of any additional evidence, to decide that the contribution action would have settled with ADM for a figure within Home's policy limits, would be pure speculation. The simple fact, asserted by Ranger, that nothing stopped Home from offering its limits during all of these periods, therefore does not change our conclusion that the evidence has failed to establish that the policy limits would have been accepted had they been offered.

### IV. Conclusion

Accordingly, Ranger has failed to establish that any alleged negligence or bad faith on the part of Home was the proximate cause of Ranger's liability for the amount of the judgment against Mid–States in excess of Home's policy limits. Because Ranger's failure to establish proximate cause is dispositive on the issue of liability, we need not make any additional findings or conclusions regarding the reasonableness of Home's conduct. We enter judgment in favor of Home on Counts II and III of Ranger's complaint. It is so ordered.