STEPHAN POZZI, Plaintiff-Appellee, v. McGEE ASSOCIATES, INC., Defendant (McDonald's Corporation *et al.*, Defendants-Appellants; Knorr and Meyers Roofing Company, Third-Party Defendant-Appellee).

First District (6th Division)   No. 1—91—0522

Opinion filed October 2, 1992.

Hinshaw & Culbertson, of Chicago (Joseph J. O'Connell, Stephen R. Swofford, and Gary J. Bazydlo, of counsel), for appellants.

Anesi, Ozmon & Rodin, Ltd., of Chicago (Curt N. Rodin, Richard A. Kimnach, and Martin J. Lucas, of counsel), for appellees.

JUSTICE RAKOWSKI delivered the opinion of the court:

The subject of this appeal is a cause of action filed under the Illinois Structural Work Act (Act) (Ill. Rev. Stat. 1983, ch. 48, par. 60 *et seq.*) by the plaintiff, Stephan Pozzi, against the defendants, McDonald's Corporation, McDonald's Restaurants of Illinois (McDonald's) and Peter Schwabe, Inc. (Schwabe), after plaintiff was injured falling from a roof. Defendants filed a third-party action against the plaintiff's employer, Knorr & Meyers Roofing Co. (Knorr & Meyers). Following a jury trial, a verdict was returned in favor of the plaintiff in the amount of $700,804.33 and in favor of the third-party plaintiffs, apportioning fault as 35% for McDonald's, 37.7% for Schwabe, and 27.3% for Knorr & Meyers. Defendants filed a post-trial motion seeking a judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied defendants' motion, and defendants filed this appeal. The issues on appeal are: (1) whether the Structural Work Act was applicable to plaintiff's injury; (2) whether it was error for the trial court to exclude evidence that plaintiff had received a warning regarding the slippery condition of the metal flashing; (3) whether the trial court erred in allowing plaintiff's expert to offer an opinion not provided during discovery; and (4) whether the trial court improperly denied defendants the opportunity to cross-examine plaintiff's expert concerning OSHA regulations.

In 1983, McDonald's decided to build a new restaurant in Rockford, Illinois. The successful bidder for the construction contract was Schwabe, a general contractor who had built several other McDonald's restaurants. Schwabe was responsible for hiring the subcontractors, one of which was Knorr & Meyers. According to the testimony of McDonald's construction project manager, Mark Goetzinger, specifications on general safety conditions were included in the contract as was a provision that Schwabe insure that all work conform to OSHA standards. Goetzinger also stated that Schwabe was required to follow McDonald's plans and specifications. Earl Barrette,

Schwabe's chairman of the board, and Goetzinger testified that one of these specifications was that the roofers were to be careful not to drip tar on the finished section of the roof. Raymond Riska, the construction engineer for McDonald's, confirmed the concern for the finished roof.

The restaurant was designed to have a "double mansard" roof which was described as a shingled roof which had a lower 30 degree slope and an upper 60 degree slope. The upper portion of the mansard, while resembling a roof, was actually a mansard wall with a flat inside vertical surface. It surrounded a flat surface roof which held heating ventilation and air conditioning equipment. The flat vertical surface extended about 3½ feet above the flat surface roof and surrounded it on the north, west, and east side of the building, leaving the south side open for access to the flat surface roof. After the wooden framework of the mansard roof was constructed, a 36-inch-wide metal valley or flashing was installed in order to provide a waterproof membrane at the mansard junctures. However, because the surface was flat sheet metal it was slippery.

Knorr & Meyers was responsible for applying hot tar on the flat surface roof, and a separate contractor was hired to shingle the mansard roof. The first two days that Knorr & Meyers worked on the project, the roofers accessed the flat roof from the south side of the building, which had no upper mansard. The plaintiff was one of its roofers. On July 8, 1983, plaintiff and his immediate supervisor, Louis Redler, who was the superintendent and owner of the company, sought access to the flat surface roof from the east side of the building. Redler had positioned the tar kettle and ladder on the east side. The tar kettle contained 500 gallons of tar which had been heated to a temperature of 600 degrees. Redler and Harold West, Schwabe's superintendent, had previously discussed McDonald's concern about spilled tar on the finished roof. Redler had moved the tar kettle and ladder to the east side of the building in order to avoid this problem. The plaintiff testified that he remembered Redler informing him that he could not use the south end of the building to get to the flat roof because the general contractor did not want tar tracked on the finished roof.

Plaintiff made his first trip up the ladder with some tools, which he carried in a five-gallon bucket. When he reached the lower mansard, he got off the ladder on the right side and angled his way up and to the left to get to the upper mansard because the lower mansard was too steep to climb straight up. When the plaintiff reached the point where the two mansards met, the top of the upper mansard

was level with the plaintiff's chest. To climb over the upper portion, he mounted it by swinging his left foot over the crest, straddling the mansard and then descending to the flat roof 3½ feet below. He then dropped off the tools and climbed down in the same manner that he had gone up. On the second trip up, plaintiff carried a mop with a six-foot handle which was covered with tar. In order to keep the tar from dripping, plaintiff carried the mop in a five-gallon bucket. The plaintiff proceeded up the wooden ladder, but when he reached the upper mansard, he was unable to lower the mop and pail because the mansard was too high. He placed the mop and bucket on top of the upper mansard and positioned himself to hold it. He then placed his left hand on top of the mansard wall and began to swing his left side over the wall. However, at that point his left heel caught the corner edge of the metal valley, and he slipped and lost his balance. In order to avoid the hot tar from the mop, the plaintiff pushed the mop over the edge and slid down the plywood mansard. He fell into the ladder, which served as a buffer between himself and the hot tar kettle as he fell to the ground below.

Goetzinger testified that there was no reason why the metal flashing which caused plaintiff to lose his balance had to be installed before the hot roof was put on. Riska stated that McDonald's could have required that the flat roof be completed before the metal flashing was installed on the mansard roof and also could have had the flashing covered. Goetzinger further testified that he believed it to be hazardous for a construction worker to gain access to the flat roof by climbing over the mansard roof, particularly if he was trying to balance a bucket with a six-foot mop handle on the six-inch ledge of the upper mansard. Riska, who replaced Goetzinger as project manager, gave a similar opinion. Barrette and West stated that the means of access would be safe if there was someone on the roof to accept the equipment.

The witnesses questioned regarding the OSHA standards acknowledged that the provision regarding ladders and scaffolds required an additional ladder for safe access to the upper mansard. West conceded that he could have ordered the carpenters on the project to make a ladder. However, Goetzinger testified that he had never seen the type of ladder required by OSHA on this jobsite and that, even though McDonald's insisted that its contractors adhere to the safety codes and regulations, Schwabe was never required to supply such a ladder.

Goetzinger described a ladder which was part of McDonald's specifications and design. It consisted of a "catwalk" and ladder which was to be attached to the rear of the building and went from the

ground level up parallel to the restaurant. It then sloped from the south end with the catwalk running from the ladder to the flat roof. The catwalk also had handrails for support. This structure would provide access to the flat roof other than via the sloped roof. However, the witnesses testified that the catwalk structure was usually set up close to or at the end of the project after the tarring of the flat roof had been completed. There was conflicting testimony as to whether the structure could be set up earlier in the project and before the flat roof was tarred.

Dennis Pulchalski, an expert in construction safety, testified on behalf of plaintiff that the mansard roof was not a safe means of access to the flat roof, that a second ladder or the McDonald's-designed ladder should have been provided, and that it was unsafe to require plaintiff to carry equipment up the ladder.

After the accident plaintiff filed a complaint against McDonald's and Schwabe which in its final form alleged the following violations of the Structural Work Act: (1) that defendants allowed plaintiff to use the mansard roof as a support to gain access to the flat roof when defendants knew or could have discovered that such access was unsafe; (2) that defendants failed to provide a ladder to gain safe access to the flat roof from the mansard roof; (3) that defendants failed to provide cleats or see that 2 by 4 cleats were provided for safe access to the flat roof from the mansard roof; (4) that defendants allowed plaintiff to carry a mop and bucket up a ladder and over the mansard when defendants knew or could have discovered that this was an unsafe use of the ladder or mansard support; and (5) that defendants failed to permit plaintiff or other workmen to use the permanently affixed rear ladder to gain access to the roof. McDonald's filed a third-party complaint against Knorr & Meyers on a negligence theory. Before trial plaintiffs brought a motion *in limine* to bar any mention of plaintiff's conduct in causing his injury which the trial court granted. However, during the third-party defendant's opening statement, the fact that plaintiff had been given a warning regarding the metal flashing was mentioned, and plaintiff's counsel requested a mistrial, which the trial court granted. The second trial commenced shortly thereafter.

Defendants contend that plaintiff's injury does not come under the purview of the Structural Work Act because plaintiff was not using the mansard roof as a scaffold or support in the process of erecting, repairing, altering, removing, or painting any part of McDonald's restaurant. The Structural work Act provides in relevant part:

"§1 That all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection,. repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." (Ill. Rev. Stat. 1983, ch. 48, par. 60.)

The purpose of the Act is to protect persons engaged in extrahazardous occupations such as the construction, repair, alteration, or removal of buildings, bridges, viaducts, or other structures. (*Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417, 422, 512 N.E.2d 1223.) The Act should be liberally construed, but it is not intended to cover all construction activities or all injuries which occur at or near a construction site. (*Vuletich*, 117 Ill. 2d at 422.) Rather, the inquiry should focus on the particular circumstances surrounding the occurrence of the injury. *Harper v. Schal Associates, Inc.* (1987), 159 Ill. App. 3d 542, 545, 510 N.E.2d 1061, citing *Ashley v. Osman & Associates, Inc.* (1983), 114 Ill. App. 3d 293, 295-96, 448 N.E.2d 1011.

■ To state a cause of action for a violation of the Act, it is necessary to show: (1) the device involved is one listed in the Act; (2) the device was used to complete a building or other structure within the Act; (3) the device was unsafe, not safely placed or operated, or there was a failure to provide such a device; (4) those in charge of the work willfully violated the Act; and (5) the violation of the Act proximately caused the plaintiff's injury. *Harper*, 159 Ill. App. 3d at 545; *Ashley*, 114 Ill. App. 3d at 296.

■ The violations of the Act, as alleged in plaintiff's first amended complaint, involve the third element, whether defendants failed to provide a safe means of support by which plaintiff could gain access to the flat roof and whether the support defendants provided was unsafe. In order to determine whether defendants violated the Act, we must first establish whether the mansard roof plaintiff used to reach the flat roof could be classified as a support under the Act. This question can be resolved by applying a three-prong analysis set forth in *Ashley*. According to this analysis, a court must ascertain (1) the intended use of the device at the time of injury, (2) whether the injury has some connection with the hazardous nature of the device,

and (3) the element of danger in the use of the device, and whether this is the type of danger that the legislature intended to alleviate by the Act.

Defendants acknowledge that a roof or other permanent structure could sometimes function as a scaffold or support depending on the intended use of the structure at the time of the injury. However, in this instance defendants claim that the mansard roof did not serve as a support because plaintiff was not working on this section of the roof but was only using it as a pathway to get to the flat roof, which was his work area. Defendants further argue that, because there was a separate contractor hired to shingle the sloped roof and plaintiff's employer was only hired to construct the flat roof, this was further evidence that plaintiff was only using the mansard roof as a pathway.

In support of their argument, defendants first rely on *Bolsmo v. Mark V Roofing Co.* (1989), 190 Ill. App. 3d 334, 546 N.E.2d 634, which was a case where a roofing company had suspended work because of the onset of winter weather. Several months later the plaintiff, on the instructions of the building owner, ascended to the roof through a hatchway in order to inspect an exhaust fan in another section of the roof. As the plaintiff exited the hatchway, he slipped and fell. The court held that the roof was not a support under the circumstances of that case because the plaintiff was only using it as a means of access to get to the exhaust fan and that inspection or electrical work on the fan was not the kind of extrahazardous activity covered by the Act. *Bolsmo*, 190 Ill. App. 3d at 337.

Defendants also rely on *Vuletich* (117 Ill. 2d 417, 512 N.E.2d 1223), where the plaintiff had been hired to clean and repair a furnace. After completing his work on the furnace, the plaintiff was returning a broom and shovel to a tool storage trailer when he slipped and fell on the trailer steps. The supreme court held that the stairs were not a support under the Act in that instance because at the time of plaintiff's injury, he was not engaged in any hazardous activity or any work that could be described as being of a hazardous nature. (*Vuletich*, 117 Ill. 2d at 424.) Similarly, the court in *Latronica v. Commonwealth Edison Co.* (1988), 171 Ill. App. 3d 202, 524 N.E.2d 1186, also relied upon by defendants, held that the plaintiff, who had been employed to operate a drill rig and who was injured when he fell as he tried to climb down from the rig, was not engaged in an extrahazardous activity contemplated by the Act. Rather, "it was one of the myriad of routine and nondangerous activities which occur on every construction site but which are not intended to be protected by the Act." *Latronica*, 171 Ill. App. 3d at 207.

Defendants also cite *Carnevale v. Inland Ryerson Building Systems* (1988), 169 Ill. App. 3d 740, 523 N.E.2d 1056, where a plumber while carrying steel pipes was injured when he fell over bar joists in a doorway of a construction site. Although the court did state that a platform over the bar joists would not have been a support because it would only have been used as an access route by the plaintiff, the court also held that the platform would not have been a support because it would not have been used by the plaintiff to perform an extrahazardous activity intended to be covered by the Act. In *Harper* (159 Ill. App. 3d 542, 510 N.E.2d 1061), an iron-worker was injured when he tripped on a depression in the ground while walking backward and dragging cable. Like the court in *Carnevale*, the *Harper* court also concluded that, had a support been provided to cover the depression, the plaintiff was not engaged in the kind of hazardous activity contemplated by the Act.

■ Defendants appear to take the position that if a support is used as a pathway, there is no coverage under the Act. However, we conclude that where a worker is using a support to perform his work and is injured as a result of a dangerous condition contemplated by the Act, the fact that the support also serves as a pathway does not exclude the worker from coverage. While some of the cases relied upon by defendants involve workers using a support as a pathway, the denial of coverage in those cases was based on a determination that the worker was not on a support or was outside of his work area when he was injured or that the occurrence was not the kind of hazardous condition contemplated by the Act.

Returning to our discussion of the three-prong test in *Ashley* as applied to the facts of this case, we conclude that the unshingled mansard roof which plaintiff attempted to climb while carrying a mop and bucket in order to gain access to the flat roof was a support pursuant to the Act. The first prong of the *Ashley* test focuses on the intended use of the device at the time of plaintiff's injury. Unlike the plaintiff in *Harper*, cited above, the plaintiff in this case had not completed work but was in the process of bringing supplies up the roof in order to perform work. Although defendants argue that the mansard roof was not plaintiff's work area, because he was employed to construct the flat roof, the only way that plaintiff could perform construction work on the flat roof was to bring the necessary supplies to the area by carrying them over the top of the upper mansard. As the court in *Ashley* stated:

"In order for plaintiff to perform his duties as a roofer, he needed materials and equipment *** [which] could not be deliv-

ered directly to the site. \*\*\* Defendants would have us believe that plaintiff was a roofer while at the building itself, and a delivery man (hence, not covered by the Act) when it became necessary for him to carry equipment from his truck to the building. This is an untenable contention and one that runs counter to the very purpose of the Act." (*Ashley*, 114 Ill. App. 3d at 299-300.)

In *Ashley*, the condition which prevented delivery of supplies directly to the site was the muddy condition of the ground. In this case it was the fact that plaintiff was told by his supervisor to deliver supplies over the mansard roof so that the tar would not be dripped on the flat roof. As in *Ashley*, defendant's contention that plaintiff was only delivering equipment while he was on the mansard roof but performing work when he reached the flat roof was also contrary to the purpose of the Act, especially where he needed the equipment to perform his work and was told that the mansard roof was his only means of access to the work site.

Addressing the second and third prongs of the *Ashley* test, the plaintiff was engaged in an extrahazardous activity which was connected with his injury when he had climbed a ladder while carrying a five-gallon bucket with a mop covered with hot tar, and he was holding these items as he continued to climb the lower mansard and tried to climb the upper one. It was at this point that he fell to the ground. The situation was made even more hazardous by virtue of the fact that there was a kettle containing 500 gallons of hot tar which had been heated to 600 degrees located near the area where plaintiff had ascended the ladder and which presented an even greater danger when plaintiff fell. We further conclude that the danger involved in this situation was the type of danger intended to be covered by the Act, which is the protection of workers engaged in extrahazardous activities from certain risks inherent in their jobs. (*Vuletich*, 117 Ill. 2d at 423; *Harper*, 159 Ill. App. 3d at 548.) The plaintiff's job in this case was hazardous by virtue of the fact that he had to transport hot tar to a roof. The risk of being able to perform this task without injury was greatly increased when plaintiff had to climb two levels of a sloped plywood roof while carrying a mop and bucket without the aid of a ladder, in order to bring these items to the work area.

■ Defendant next contends that the evidence that plaintiff was warned of the slippery condition of the metal flashing should not have been excluded because it was evidence of the proximate cause of plaintiff's injury which is one of the elements of a claim under the Act. (*Stonitsch v. Laredo Construction Co.* (1991), 221 Ill. App. 3d

902, 905, 583 N.E.2d 49.) However, there was sufficient evidence presented at trial based on the testimony of McDonald's witnesses as well as plaintiff's expert that the mansard roof without a ladder was an unsafe support and that plaintiff's use of this unsafe support was the proximate cause of his injury. Therefore, any conduct by plaintiff which allegedly might have increased plaintiff's risk, such as his failure to heed a warning by his supervisor, was only evidence of plaintiff's contributory or comparative negligence, which is not applicable in a cause of action under the Act. *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 460, 473 N.E.2d 946.

Defendants rely on *Marine Bank v. Archer Daniels Midland* (1987), 156 Ill. App. 576, 509 N.E.2d 163, in support of their argument that the evidence of a verbal warning was improperly excluded. In *Marine Bank*, the decedent fell from a feedhouse roof he was attempting to cross in order to inspect a roof of another building. The court noted that the decedent had been instructed to use a safer route and held that the fact that he chose to take a more dangerous one, contrary to instructions, "[did] not convert the roof into a support or scaffold." (*Marine Bank*, 156 Ill. App. 3d at 579.) The issue was not that the decedent's conduct was evidence of the proximate cause of the accident.

Defendants next argue that they were also entitled to present evidence of the warning because there was evidence of an alternative pathway. The alternative pathway to which defendants refer was the direct route to the flat roof on the south side of the building. Plaintiff testified at the trial that his supervisor told him that he had to get to the flat roof from the east side of the building because they could not get any "stuff" on the finished product. When asked where his supervisor got that information, plaintiff replied that it was his understanding that the general contractor had said that the roofers were not to walk across the flat roof in order to avoid tracking tar on the "finished product." Defendants argue that the admission of these statements was error because they were hearsay. However, neither the plaintiff's reference to his supervisor's statement nor those of the general contractor to his supervisor were statements offered for the truth of the matter asserted but only to provide an explanation for plaintiff's presence on the east side of the building. Defendants claim that plaintiff's testimony was contradicted by that of his supervisor, Louis Redler. When asked the specific question by defense counsel, Redler did acknowledge that he was never told by the superintendent of Schwabe that he could not use the south side of the building to reach the flat roof, but he also stated that he had spoken with the su-

perintendent about being very neat and not dropping, spilling or in any way getting asphalt on the finished roofing material. Redler further testified that he had moved the tar kettle and the ladder to the east side of the building on the day of the accident because "bringing the tar up on the unfinished roof, you eliminate those problems [tracking or dripping tar]." We conclude that, even without plaintiff's alleged hearsay statements, the fact that Redler had placed the ladder and tar kettle on the east side of the building with the expectation that the unfinished mansard roof was to be used as a route to the flat roof was sufficient evidence to support the determination that plaintiff had no alternative pathway.

▮ Defendants' remaining arguments regarding other measures the plaintiff could have used to avoid the accident would only be additional evidence of plaintiff's contributory negligence. Also without merit is defendants' argument that the warning regarding the metal flashing could have made the otherwise unsafe mansard roof safe. In this case, the mansard roof was unsafe because no ladder was provided for plaintiff to climb from the lower mansard to the top of the upper one. The situation became even more hazardous when plaintiff had to perform this task while carrying a bucket and mop. A warning regarding the metal flashing did not make this situation any less dangerous.

Defendants contend that it was error to allow plaintiff's expert to testify regarding a type of ladder that should have been provided as well as safety programs and inspections where these opinions were not disclosed in discovery. Under Supreme Court Rule 220(d) (107 Ill. 2d R. 220(d)), which governs expert testimony, an expert's trial testimony cannot be inconsistent with or go beyond the scope of the facts known or the opinions disclosed in discovery. (*Zajac v. St. Mary of Nazareth Hospital Center* (1991), 212 Ill. App. 3d 779, 792, 571 N.E.2d 840; *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 69, 540 N.E.2d 770.) However, Rule 220(d) provides in relevant part that the expert "shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." (107 Ill. 2d R. 220(d).) Furthermore, the admission of evidence is within the sound discretion of the trial court, and its decision will not be reversed absent a clear abuse of discretion. *Swaw v. Klompien* (1988), 168 Ill. App. 3d 705, 715, 522 N.E.2d 1267.

▮ During a side-bar conference, it was brought to the attention of the trial judge that during his deposition Pulchalski had testified regarding the Associated General Contractors' Manual, which contained the safety standards at issue. At that time, Pulchalski stated

that the manual was authoritative and that it was one of the materials he would be relying on for this case. Thus, defendants had the opportunity to question Pulchalski regarding the specific safety standards that were part of the expert's trial testimony, and they cannot now claim that they were surprised or prejudiced. *Swaw*, 168 Ill. App. 3d at 715.

Defendants also contend that it was error to admit Pulchalski's trial testimony regarding the design of a suitable ladder because it was different than the type of ladder he identified at his deposition. Plaintiff argues that Pulchalski did not describe a different ladder during his deposition and that defendants would have recognized this fact if they had questioned Pulchalski more extensively regarding the ladder at that time. While it is difficult to determine how dissimilar the ladders were, we note that defendants' liability was based on the fact that they failed to provide any ladder that would have made the mansard roof a safer support, not that they failed to provide a proper one. Therefore, we fail to see how defendants were prejudiced by the trial court's ruling. In any event, given the limited description of the two ladders, we conclude that the trial court's ruling was not an abuse of discretion.

Defendants finally contend that the trial court erred in denying them the right to cross-examine plaintiff's expert witness on relevant OSHA provisions when the expert had been relying on OSHA provisions during his direct testimony. The specific regulations at issue are 29 C.F.R. §§1910.11, 1910.12, and 1926.450 (1983). Regulation 1926.450 provides requirements and specifications for ladders and scaffolding. Regulations 1910.11 and 1910.12 present the scope and purpose of the guidelines and how they are applied. Defendants claim that because plaintiff's expert relied on section 1926.450 during his direct testimony, they should have been permitted to cross-examine him regarding these other two provisions.

A construction expert may testify that OSHA regulations were violated on a jobsite for the limited purpose of establishing a standard of care. (*Ryan v. Mobil Oil Corp.* (1987), 157 Ill. App. 3d 1069, 1077, 510 N.E.2d 1162; *LePage v. Walsh Construction Co.* (1984), 126 Ill. App. 3d 1075, 1076, 468 N.E.2d 509.) Defendants argue that they should have been allowed to cross-examine plaintiff's expert on the other provisions of OSHA because the expert testified that the provision pertaining to ladders and scaffolds was a code which had been violated. The provisions that defendants started to address in cross-examination contained the language that OSHA was applicable to employees, places of employment and employers. Defendants sought to

present these provisions as evidence that OSHA was not a code which a nonemployer could violate.

In support of their argument that they should have been given an opportunity to cross-examine plaintiff's expert on sections 1910.11 and 1910.12, defendants cite *Foster v. Devilbiss Co.* (1988), 174 Ill. App. 3d 359, 366, 529 N.E.2d 581, and *Hall v. Archer-Daniels-Midland Co.* (1986), 142 Ill. App. 3d 200, 491 N.E.2d 879, *rev'd on other grounds* (1988), 122 Ill. 2d 448, 524 N.E.2d 586. In *Foster v. Devilbiss Co.*, the court held that cross-examination of defendant's expert was proper because the expert, on direct examination, had stated that OSHA regulations were not applicable. Therefore cross-examination was within the scope of the expert's direct testimony. (*Foster*, 174 Ill. App. 3d at 366.) In *Hall v. Archer-Daniels-Midland Co.*, the issue determined by the court was that the testimony of two of defendant's expert witnesses on OSHA was admissible on the ultimate issue of whether defendants violated the Act as long as the testimony assisted the jury in understanding the evidence or determining the facts at issue. (*Hall*, 142 Ill. App. 3d at 213-14.) We conclude that both cases are factually dissimilar to this case.

■ In this case, the testimony presented by plaintiff's expert as well as the prior witnesses all related to the OSHA provision regarding ladders and scaffolds, and defendants were allowed to cross-examine the expert regarding this provision. In addition, although plaintiff's expert testified that the regulation pertaining to ladders and scaffolds had been violated, he did not testify regarding the legal duty to follow the regulation. Furthermore, whether or not defendants had a duty to follow the OSHA regulations because they were in charge of the project, defendants had agreed and had included in the construction contract provisions that the project would be performed according to OSHA regulations. Therefore, we conclude that the trial court's restriction of defendants' cross-examination on the regulations not addressed in the witness' direct testimony was not an abuse of discretion.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA and McNULTY,* JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument before her death. Justice McNulty was substituted on the panel. She has listened to the oral argument tape and has read the briefs.