FIRST DIVISION
May 8, 2006

No. 1-05-1203


ELENA RECIO, Individually and as Special Administrator )    Appeal from the
of the Estate of Ceasar Recio, Jr., Deceased,                )    Circuit Court of
                                                       )   Cook County.
                Plaintiff-Appellant,                )

v.                                                    )   No. 02 M6 1211
                                                       )
GR-MHA CORPORATION, an Illinois Corporation;     )
GR-MHA CORPORATION, d/b/a Ginger Ridge         )
Apartments; GINGER RIDGE APARTMENTS;         )
GINGER RIDGE M.H.A.; GINGER RIDGE LIMITED   )
PARTNERSHIP; GINGER RIDGE LIMITED            )
PARTNERSHIP, d/b/a Ginger Ridge Apartments;     )
DON DeVINCENT; GREAT LAKES ROOFING AND   )
CONSTRUCTION COMPANY, INC., a Foreign        )
Corporation; SIGNATURE HOUSING              )
SOLUTIONS, INC., a Foreign Corporation;        )
and SIGNATURE HOUSING SOLUTIONS, LLC.,    )
an Illinois Limited Liability Company,            )   Honorable
                                                      )   Jeffrey Lawrence,
                Defendants-Appellees.        )   Judge Presiding.


JUSTICE GORDON delivered the opinion of the court:

Ceasar Recio, Jr. (Ceasar), was employed as a roofer by an unlicensed subcontractor, DTM Construction Company (DTM),[1] on a remodeling project for GR-MHA Corp., the Ginger Ridge defendants, and the Signature Housing Solutions

---

[1]DTM was not named a defendant in this action because the Illinois Workers' Compensation Act (820 ILCS 305/5(a) (West 2000)) bars injured workers from suing their employers.

No. 1-05-1203

defendants (collectively, Ginger Ridge), which owned and operated an apartment complex. While carrying a bundle of shingles to the roof of a two-story Ginger Ridge apartment building, Ceasar apparently lost his balance, fell to the ground and was severely injured. The next day, Ceasar died from his injuries. His widow, plaintiff Elena Recio, brought this survival and wrongful death action against Ginger Ridge and Great Lakes Roofing & Construction Co. (Great Lakes), the contractor that had subcontracted roofing work to DTM, alleging that they were negligent in permitting Ceasar to climb a ladder while carrying a load of shingles—which, plaintiff asserts, is an unsafe work practice. Subsequently, without further amending her complaint, plaintiff raised additional theories of liability against Great Lakes based on its hiring an unlicensed subcontractor, in violation of the applicable municipal ordinances. The circuit court granted defendants' motions for summary judgment. For the reasons that follow, we affirm.

BACKGROUND

In her amended complaint, plaintiff alleged the following. The incident occurred on October 25, 2000. While in the performance of his job duties in connection with the Ginger Ridge project, Ceasar fell from the roof of the building where he was working to

2

the ground below.[2]

In counts I (survival action) and II (wrongful death action) directed at Ginger Ridge, plaintiff alleged that Ginger Ridge owed Ceasar a duty "to use reasonable care in the operation, management, maintenance and/or control of the construction project to avoid injury and/or death to those on and around the site." Plaintiff further alleged that Ginger Ridge breached its duty of care by failing to exercise due care in the management, maintenance, supervision, and/or control of the construction site; allowing a dangerous condition to exist at the construction site; negligently warning or failing to warn Ceasar of the dangerous condition; negligently providing or failing to provide adequate safety equipment to prevent injury to Ceasar; negligently enforcing or failing to establish and enforce safe work rules at the construction site; negligently supervising

---

[2]The record indicates that the eyewitnesses were not sure whether Ceasar fell from the ladder, the roof, or while stepping from the ladder to the roof. No eyewitness depositions were taken.

or failing to provide competent and careful supervision of Ceasar's work; and/or failing to provide a safe workplace for Ceasar.

In counts III (survival action) and IV (wrongful death action) directed at Great Lakes, plaintiff alleged that DTM, which had employed Ceasar, was a subcontractor of Great Lakes. Plaintiff stated the same theory of negligence against Great Lakes as she did against Ginger Ridge.

Discovery depositions were taken of Daniel McKenna, president of DTM; Russell Peterson, the owner of Great Lakes; Don DeVincent, maintenance superintendent for Ginger Ridge; and Elsie James, property manager for Ginger Ridge.

McKenna testified that DTM was an independent corporation, distinct from Great Lakes. DTM had an established relationship with Great Lakes and was retained on many projects for Great Lakes. Typically, Great Lakes would send McKenna a "lead" about a potential construction project, and McKenna would then submit to Great Lakes his cost estimate. If DTM was hired to work on a project, McKenna, in the dealings with the property owner, would usually represent that he and his crew were employees of Great Lakes, since the owner had contracted with Great Lakes. McKenna was not sure if he made such representation to DeVincent.

McKenna further testified that for the Ginger Ridge project, Great Lakes similarly acted as, in essence, a broker. The subcontracting agreement between Great Lakes and DTM was oral. Aside from obtaining a building permit, Great Lakes was not involved in the project's operations. Great Lakes did not establish any rules or requirements for DTM to follow, and neither did Ginger Ridge. As was its custom on

4

other projects, Great Lakes never sent anyone to monitor or inspect DTM's work and did not require DTM to conduct safety "toolbox talks" for its (DTM's) employees. However, McKenna stated that he approached Great Lakes about "toolbox talks" brochures pertaining to safety and, on his own initiative, conducted such talks with his employees. McKenna would then return signed forms to Great Lakes showing his employees' participation.

McKenna further testified that before the roofing work was to begin, DeVincent told him to start with the roofs in the worst shape. In all other respects, DTM had exclusive authority as to how the roofing project was to be accomplished. DTM employees did not consult with DeVincent or Great Lakes about the specifics of how the work would be performed. DTM used its own equipment and none of Great Lakes' or Ginger Ridge's equipment. DTM also purchased all construction materials used in the project. No materials came from Great Lakes. The supplier of roofing materials brought them to the site and lifted them up with a crane to the roofs.

The morning of the day of the incident, DTM determined that it did not have enough bundles of shingles on the roof to complete the job. One of DTM employees bought extra bundles of shingles from a local store and delivered them to the site. McKenna stated that it was DTM's practice under such circumstances to have the employees carry the bundles, weighing between 70 and 90 pounds, up a ladder to the roof. DTM had trained its workers to climb a ladder while carrying a bundle on the shoulder. McKenna further stated that it was an accepted custom and practice in the construction industry to deliver shingles to the roof in that manner. According to

5

McKenna, Great Lakes never expressed concern about this practice. McKenna did not personally witness Ceasar's fall, but later learned from DTM employees that Ceasar fell while attempting to carry a bundle of shingles to the roof.

McKenna admitted that, at the time, DTM did not have a contractor's license, which was required in Calumet City, Illinois, where the Ginger Ridge complex was located. McKenna could not recall whether he informed Great Lakes of that fact. McKenna indicated that getting a Calumet City contractor's license was a routine matter, requiring completion of an application and payment of a fee. McKenna further indicated that DTM did have a Calumet City license in 1998, but let it lapse. Nothing in the record indicates that DTM would have been denied a license had it applied for it. Lastly, McKenna stated that Ceasar had been employed by DTM for approximately a month and a half.

Peterson, the owner of Great Lakes, testified that DTM did all of Great Lakes' shingle work. Peterson admitted that Great Lakes took out a building permit for the project, and thereby agreed that all work would be done "in accordance with all ordinances, rules and regulations of the City of Calumet City, Illinois." Peterson stated that he generally asked McKenna that DTM follow common safety procedures and on occasion provided him with brochures describing such procedures. Peterson testified consistently with McKenna that McKenna would return signed forms to him showing DTM employee participation in safety training. Great Lakes took no other steps to ensure that DTM had a safety program in place and the work was being done safely, but rather left that up to McKenna. Peterson, however, stated that if he saw DTM

6

employees perform work unsafely, he would contact McKenna and request that work be done safely. Peterson also stated that Great Lakes did not take any steps to ensure DTM's compliance with Calumet City's ordinances, rules and regulations.

Peterson further testified that DTM, and not Great Lakes, provided all the equipment and materials to perform the work at Ginger Ridge, and DTM had sole discretion as to how the work would be performed. Peterson additionally testified consistently with McKenna that DTM workers would represent to be working for Great Lakes: "if somebody were to come to the job and ask—if *** Calumet City's inspector[] comes on the job and says who is doing the job, [DTM] would say Great Lakes Roofing." Lastly, Peterson indicated that carrying certain materials, such as shingles, up a ladder is an accepted practice, but stated that he personally would not do it.

DeVincent, maintenance superintendent for Ginger Ridge, testified that prior to being employed by Ginger Ridge, he owned a construction company that did general contracting. DeVincent indicated that he had expertise in that area. When DeVincent was deciding whether to hire Great Lakes to do the roofing job, his contact at Great Lakes was McKenna. McKenna informed DeVincent that he was with Great Lakes' roofing subcontractor. DeVincent testified that it was common to have subcontractors do certain work for a contractor, and he "didn't think much of it." Once Ginger Ridge received a formal job proposal from Great Lakes, DeVincent told his superiors that Great Lakes' subcontractor would be working on the project. Before the work was to start, DeVincent required Great Lakes to show him its license and building permit, both of which McKenna produced. DeVincent also asked McKenna to show him DTM's

license because he did not want anyone unlicensed working on the project. According to DeVincent, McKenna then gave him an impression that DTM was a subsidiary of Great Lakes. DeVincent stated that McKenna had signed Great Lakes' paperwork in connection with the project and held himself out to be an employee of Great Lakes. DeVicent also noted that on the job the roofers wore shirts with Great Lakes insignia.

DeVincent further testified that he would frequently walk around the jobsite when the roofing work was being done, estimating that he would observe the roofers between 20 and 30 times a day. However, DeVincent did not supervise DTM workers, except for letting them know when they were doing something wrong or unsafe. Ginger Ridge did not provide DTM workers with any tools or equipment.

Regarding the practice of carrying bundles of shingles up a ladder to the roof, DeVincent testified that it is "an accident waiting to happen ***[;] if you're *** carrying up a couple of bundles, I can see it; but not for *** 30, 40 bundles." DeVincent stated that he had instructed his maintenance workers not to carry materials or equipment up a ladder. DeVincent further stated that he would reprimand his workers for doing that because carrying materials or equipment up a ladder is "insane. Basically when you're carrying stuff ***, you can go off balance very easily." In the morning on the day of the incident, DeVincent was in his office where he could not see the roofers. DeVincent did not witness Ceasar's fall and did not know what caused Ceasar to fall. Nor did DeVincent know whether Ceasar fell from the ladder or the roof.

James, property manager for Ginger Ridge, testified that Ginger Ridge did not require its contractors to notify it or obtain permission before subcontracting work, but

expected that it would be so informed. At the time of the incident, James believed that Great Lakes was doing the roofing work because Great Lakes, and not DTM, was hired for that job. Only after the incident did James learn that the work was being performed by DTM. James further testified that Ginger Ridge did not provide Great Lakes with any equipment and did not obtain building permits for it. James stated that obtaining applicable building permits was the contractor's responsibility, and she understood that Great Lakes obtained the necessary building permits for the project. Ginger Ridge did not supervise the roofing work and relied on Great Lakes to supervise the work and enforce worker safety standards. Ginger Ridge had no specific safety rules for contractors to follow and did not provide contractors with any safety handbooks; however, James agreed that DeVincent, as the maintenance superintendent for Ginger Ridge, had the authority to stop the work being done improperly or unsafely. On occasion, James checked on the roofers' progress, but did not observe anything that looked unsafe. James never observed the roofers carry bundles of shingles up a ladder to the roof. James did not witness Ceasar's fall, but named two residents of the Ginger Ridge complex who did.

In November and December of 2000, the area office of the Occupational Safety and Health Administration (OSHA) conducted its own investigation of the incident and determined that the incident did not stem from an OSHA violation.

*Defendants' Motions for Summary Judgment*

On September 21, 2004, Ginger Ridge moved for summary judgment on the ground that it did not owe Ceasar a duty of care because it did not exercise any control

or supervision over the manner and means of the roofing work performed by DTM, an independent contractor. Soon thereafter, on November 12, 2004, Great Lakes moved for summary judgment on similar grounds. In their arguments, both defendants invoked the "retained control" theory articulated in section 414 of the Restatement (Second) of Torts (the Restatement). Section 414, which has been adopted in Illinois, provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care. Restatement (Second) of Torts §414, at 387 (1965).

The "retained control" concept is further explained in comment *c* to section 414:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. *There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way*."
(Emphasis added.) Restatement (Second) of Torts §414, Comment *c*, at 388

10

No. 1-05-1203

(1965).

Plaintiff responded that Ginger Ridge should be held liable on the theory of premises liability articulated in section 343 of the Restatement (*Restatement* (Second) of Torts §*343, at 215-16 1965* ), which has also been adopted in Illinois and applied in cases where a construction worker was injured on the jobsite. Section 343 provides:

"*A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he*

*a  knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and*

*b  should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and*

*c  fails to exercise reasonable care to protect them against the danger.*

*Restatement* (Second) of Torts §*343, at 215-16 1965 .*

Plaintiff argued that Ceasar's fall was attributable to a dangerous condition on Ginger Ridge's property. With respect to her claims against Great Lakes, plaintiff argued that Great Lakes assumed a duty of care towards Ceasar by the virtue of procuring a building permit which required that all work be done in accordance with the ordinances, rules and regulations of Calumet City. Plaintiff asserted that Great Lakes breached its duty of care by hiring an unlicensed and incompetent contractor. Plaintiff additionally argued that Great Lakes should be equitably estopped from denying it had control over the work of DTM because Great Lakes benefitted from allowing DTM to hold itself out as Great Lakes. On March 9, 2005, the circuit court granted both motions for summary

11

No. 1-05-1203

judgment. At the close of oral argument on the motions for summary judgment, the circuit court stated its reasons for granting the motions as follows. With respect to the claims against Ginger Ridge based on premises liability, the circuit court found that the premises liability doctrine was inapplicable under these facts. The court noted that the record showed that Ceasar fell while trying to carry a bundle of shingles up a ladder to the roof, whereas the theory of premises liability required evidence of a defect on Ginger Ridge's premises, *i.e.*, the building or the land. The court further noted that nothing in the record suggested that Ginger Ridge had notice that Ceasar was carrying shingles up a ladder. With respect to the theory of retained control, the circuit court found that neither defendant retained sufficient control over DTM's work to expose itself to liability. Lastly, with respect to plaintiff's estoppel argument, the circuit court noted that the essential element of estoppel—detrimental reliance—was lacking because Ceasar did not rely on DTM's misrepresentation to his detriment. The theory of Great Lakes' liability based on hiring an unlicensed and allegedly incompetent subcontractor was not discussed during the oral argument. Plaintiff timely filed a notice of appeal on April 7, 2005.

ANALYSIS

On appeal, plaintiff contends that (1) summary judgment in favor of Great Lakes was improper because Great Lakes had assumed a duty to ensure safety at the jobsite when it obtained a building permit for the project, thereby agreeing that all work would be done "in accordance with all ordinances, rules and regulations of the City of Calumet City, Illinois," and Ceasar's injury and death resulted from the breach of that duty; and

12

No. 1-05-1203

(2) summary judgment in favor of Ginger Ridge was improper because Ginger Ridge had failed to exercise reasonable care to protect Ceasar from a dangerous condition on its property.  Plaintiff has abandoned the earlier theory raised in her amended complaint that Great Lakes and Ginger Ridge retained sufficient control over the means and methods of work performed by DTM to expose themselves to vicarious liability pursuant to section 414 of the Restatement.

Summary judgment is appropriate only where the pleadings, depositions, admissions and affidavits on file show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 2002); Horwitz v. Holabird & Root, 212 Ill. 2d 1, 8, 816 N.E.2d 272 (2004).  Our review of a grant of summary judgment is *de novo.*  Horwitz, 212 Ill. 2d at 8.

The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach.  Ward v. K mart Corp., 136 Ill. 2d 132, 140, 554 N.E.2d 223 (1990).  Plaintiff asserts that by obtaining a building permit from Calumet City, Great Lakes became obligated to comply not only with Calumet City's ordinances, rules and regulations, but also with all other applicable laws regulating contractors, including federal OSHA regulations regarding ladder safety.  Plaintiff points out that the applicable OSHA standard requires that, when using a ladder, "[a]n employee shall not carry any object or load that could cause the employee to lose balance and fall" (29 C.F.R. 1926.1053(b)(22) (2005)).  Plaintiff further cites to Kalata v. Anheuser-Busch Cos., 144 Ill. 2d 425, 434-35, 581 N.E.2d 656 (1991), where the supreme court stated:

13

No. 1-05-1203

"A violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence. (Barthel v. Illinois Central Gulf R.R. Co., (1978) 74 Ill. 2d 213, 219.) A party injured by such a violation may recover only by showing that the violation proximately caused his injury and the statute or ordinance was intended to protect a class of persons to which he belongs from the kind of injury that he suffered. (Barthel, 74 Ill. 2d at 219-20; Ney v. Yellow Cab Co., (1954) 2 Ill. 2d 74, 76-79.)"

Plaintiff therefore contends that Great Lakes was under a duty to ensure that its subcontractor's employees did not carry bundles of shingles up a ladder to the roof. We disagree. Plaintiff misconstrues the meaning of Kalata. As our supreme court explained in Feldscher v. E&B, Inc., 95 Ill. 2d 360, 370, 447 N.E.2d 1331 (1983), where a statute or ordinance did not create a private right of action, its violation would only be relevant to whether the defendant "had acted with less than reasonable care. It would not have the effect of creating a duty to [the plaintiff] where none existed." We note that in promulgating OSHA regulations, Congress expressed that "[n]othing in this chapter shall be construed to *** enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653 (b)(4) (2000). We therefore specifically held in Ross v. Dae Julie, Inc., 341 Ill. App. 3d 1065, 1074, 793 N.E.2d 68 (2003), that although a violation of OSHA regulations may be evidence of failure to exercise reasonable care, OSHA regulations do not create a duty of

14

No. 1-05-1203

care. Accordingly, plaintiff's reliance on the OSHA regulation for the proposition that it created a duty of care on the part of Great Lakes is misplaced.

Similarly, with regard to Calumet City's municipal code provisions regarding building permits and contractor licensing, we note that plaintiff did not point to any language purporting to authorize a private right of action in the event a contractor fails to ensure that its subcontractor is licensed. Although we agree with plaintiff that the applicable municipal code provisions were designed to protect the public (see Village of Maywood v. Weglarz, 24 Ill. App. 2d 495, 165 N.E.2d 362 (1960)), such provisions, as discussed, do not create a duty of care. See Feldscher, 95 Ill. 2d at 370; accord Finkle v. Mayerchak, 578 So. 2d 396 (Fla. App. 1991) (regulatory statute requiring contractors to be licensed did not create a private right of action by homeowners against a broker who obtained a building permit for an unlicensed contractor).

We must therefore determine whether Great Lakes may be liable for a breach of any common-law duties raised by plaintiff. Plaintiff raises, by implication, an employer's common-law duty to exercise reasonable care in hiring an independent contractor. See, *e.g.*, Restatement (Second) of Torts §411(a), at 376 (1965) ("An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable *care to employ a competent and careful contractor to do work which will involve a risk of physical harm unless it is skillfully and carefully done*. To prevail under this theory, plaintiff must show that Great Lakes negligently hired DTM, whom Great Lakes knew or should have known to be unfit for the job, so as to create a danger of harm to third persons. See Jones v. Beker, 260 Ill. App. 3d 481, 486, 632 N.E.2d 273 (1994). In addition, plaintiff must show

15

that DTM's particular unfitness proximately caused harm to Ceasar. See Jones, 260 Ill. App. 3d at 486; Huber v. Seaton, 186 Ill. App. 3d 503, 507, 542 N.E.2d 464 (1989).

We question from the outset whether an employee of a negligently retained entity may recover under this theory. It would appear that such an employee is not within the class of third parties to whom a duty of care in hiring an independent contractor extends. We take note, however, of case law to the contrary. See Bagley v. Insight Communications Co., L.P., 658 N.E.2d 584, 588 (Ind. 1995) (an employee of a negligently retained independent contractor is not deprived of the right to sue for negligent hiring the one who hired the independent contractor). In any event, plaintiff's claim fails under the standard negligence analysis applicable to these facts.

The record here supports a contention that Great Lakes committed an omission in failing to ensure DTM was licensed in Calumet City. However, "[t]he lack of a license alone does not automatically make [DTM] unfit." Jones, 260 Ill. App. 3d at 486. In this regard, we note that no evidence was presented that DTM was an unfit or incompetent subcontractor. Moreover, plaintiff failed to establish a causal connection between DTM's lack of Calumet City license and Ceasar's injury and subsequent death. We note that, according to McKenna, DTM used to be licensed in Calumet City in 1998, and there is no evidence that it would have been denied a license had it applied in 2000. We further note that Ceasar commenced employment with DTM before DTM failed to take out a license to do construction work in Calumet City, thus becoming an unlicensed contractor in Calumet City. There is also no evidence that Ceasar ever relied on Great Lakes to ensure that DTM was licensed in Calumet City in making his decision to be

16

No. 1-05-1203

employed by DTM on the Ginger Ridge project.

It bears reiterating that an employer of an independent contractor is generally not liable for the independent contractor's acts or omissions. See Gomien v. Wear-Ever Aluminum, Inc., 50 Ill. 2d 19, 21, *276 N.E.2d 336* (1971). However, as we explained in our recent decision in Cochran v. George Sollitt Construction Co., 358 Ill. App. 3d 865, 832 N.E.2d 355 (2005), pursuant to the exceptions to that rule articulated in section 414 of the Restatement, an employer of an independent contractor may nevertheless be subject to vicarious liability for the contractor's negligence if the employer retains control over the operative details of the contractor's work; alternatively, even in the absence of such control, an employer may be subject to direct liability where it assumes supervisory duties on a construction project and fails to exercise them with reasonable care (see also, *e.g.*, Restatement (Second) of Contracts §304, Comment *b*, at 448 (1981) ("*the parties to a contract have the power, if they so intend, to create a right in a third person*")). In either case, the scope of liability of an employer of an independent contractor is determined by the scope of its undertaking. Moreover, such an employer cannot be held liable unless it knew or had reason to know of danger to the contractor's workers. Cochran, 358 Ill. App. 3d at 877, 879-80. Here, there is no dispute that Great Lakes did not retain enough control over the project to subject itself to vicarious liability, did not undertake to supervise DTM workers (which would have subjected it to direct liability), and had no actual or constructive knowledge that Ceasar would carry a bundle of shingles up a ladder. Lastly, Moss v. Rowe Construction Co., 344 Ill. App. 3d 772, 801 N.E.2d 612 (2003), Pozzi v. McGee Associates, Inc., 236 Ill. App. 3d 390, 602 N.E.2d

17

1302 (1992), and Ralls v. Village of Glendale Heights, 233 Ill. App. 3d 147, 598 N.E.2d 337 (1992)—on which plaintiff relies for the proposition that an employer of an independent contractor may contractually assume a duty to ensure compliance with OSHA standards—are distinguishable because Great Lakes did not undertake any such duty pursuant to the oral subcontracting agreement with DTM.

Plaintiff, in the alternative, contends, as she did below, that Great Lakes should be estopped from denying control over the work of DTM because Great Lakes and DTM had conspired to mislead Calumet City's building inspectors by telling them that Great Lakes, and not DTM which was unlicensed, was doing the roofing work.  Plaintiff thus combines the theory of equitable estoppel with a claim of civil conspiracy, which was not pled in her amended complaint.  Plaintiff also appears to argue the theory of conspiracy in its own right.  Plaintiff's election to stand on her amended complaint, which does not allege a *prima facie* case of conspiracy, or even allege that DTM was unlicensed, would preclude her from raising the conspiracy theory on review in its own right.  See Hagood v. O'Conner, 165 Ill. App. 3d 367, 370, 519 N.E.2d 66 (1988) ("The plaintiff in the instant case initially elected to stand on his pleadings and chose not to request leave to amend from the trial court. *** Because the plaintiff deliberately chose to stand on his pleadings as filed and failed to request leave to amend at the trial level, we will not consider his prayer for this relief on appeal"); Continental Building Corp. v. Union Oil Co. of California, 152 Ill. App. 3d 513, 517, 504 N.E.2d 787 (1987) ("A complaint which fails to allege facts, the existence of which are necessary to enable plaintiff to recover, does not state a cause of action, and its deficiency may not be remedied by liberal

18

construction or argument").  The estoppel argument, on the other hand, would be preserved for our consideration because it pertains to Great Lakes' control over DTM's work.  The theory of supervisory control was raised, albeit cursorily, in the pleadings and was extensively argued in the course of the proceedings in the circuit court.  However, plaintiff cites no cases showing how the doctrine of equitable estoppel would apply to the facts of the instant case.  The estoppel argument would therefore be waived on appeal.  See 188 Ill. 2d R. 341(e)(7) (arguments must be supported by citation to pertinent legal authority).

Waiver aside, plaintiff would not be able to prevail under either theory on its merits.  Here, plaintiff would have had to allege that Great Lakes conspired with DTM to enable it to operate without a license.  In this regard, we note that proximate cause is still a required element of the cause of action for conspiracy.  See Scott v. Aldi, Inc., 301 Ill. App. 3d 459, 464, 703 N.E.2d 526 (1998); Restatement (Second) of Torts §876, Comment *d* (1979).  However, as discussed, there is no evidence that DTM would have been denied a Calumet City license had it applied for it prior to commencing work on the Ginger Ridge project, and there is no evidence that Ceasar ever relied on Great Lakes to ensure that DTM was licensed in Calumet City in making his decision to be employed by DTM on the project.  In other words, there is no causal connection between the purported conspiracy and Ceasar's injury and subsequent death.  *Cf.* Scott, 301 Ill. App. 3d at 461 (the element of proximate cause was properly pled where the plaintiff alleged that Aldi's employees allowed and participated in solicitation of unlicensed taxi service to the customers of the Aldi store and escorted the plaintiff to an agent of an unlicensed

19

taxi who helped the plaintiff into a vehicle, and further alleged that the unlicensed driver's negligence caused the accident in which she was injured).

Plaintiff's estoppel theory would similarly fail. Preliminarily, we note that it would be anomalous for plaintiff to urge that since DTM employees held themselves out to be working for Great Lakes, Great Lakes should be estopped from denying control over the work of DTM. The irony in this contention is that in order to impose a duty of care on Great Lakes, plaintiff, in effect, suggests that Great Lakes be regarded as Ceasar's employer. However, under this theory, plaintiff's claims against Great Lakes would be barred by the Workers' Compensation Act. That aside, the doctrine of equitable estoppel is wholly inappropriate on these facts since it comes into play only where a party, by his or her own statements or conduct, induces a second party to rely, to his or her detriment, on the statements or conduct of the first party (In re Marriage of Smith, 347 Ill. App. 3d 395, 399, 806 N.E.2d 727 (2004)).

> "To establish equitable estoppel, the party claiming the estoppel must demonstrate that: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time he or she made the representations that they were untrue; (3) the party claiming the estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other party intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith, to his or her detriment; and (6) the party

20

claiming estoppel would be prejudiced by his or her reliance on the representations if the other party is permitted to deny the truth thereof. Geddes[ v. Mill Creek Country Club, Inc.], 196 Ill. 2d [302,] 313-14[, 751 N.E.2d 1150 (2001)] ." Boelkes v. Harlem Consolidated School District No. 122, 363 Ill. App. 3d 551, 557, 842 N.E.2d 790 (2006).

Obviously, under the facts of this case, plaintiff cannot claim that Ceasar was induced to act upon any misrepresentations of DTM or Great Lakes. Whatever misrepresentations DTM and Great Lakes may have made to Ginger Ridge or Calumet City's building inspectors pertained to the identity of DTM, in that DTM was held out to be Great Lakes. Ceasar, as an employee of DTM, was unquestionably well aware of the true identity of his employer. Therefore, any claim of detrimental reliance would be reduced to an absurdity.

Next, with respect to Ginger Ridge, plaintiff contends that she stated a *prima facie* cause of action for premises liability under section 343 of the Restatement. Plaintiff asserts that Ceasar's carrying a bundle of shingles up a ladder was an activity on the land that is within the purview of section 343. In other words, plaintiff argues that Ginger Ridge, as an owner and possessor of the premises where construction work took place, was obligated to exercise reasonable care to protect Ceasar against danger inherent in the allegedly unsafe work practice. However, as the circuit court noted, section 343 is ill-suited for application to such facts. In Bokodi v. Foster Wheeler Robbins, Inc., 312 Ill. App. 3d 1051, 728 N.E.2d 726 (2000), we declined to analyze under section 343 a similar claim based upon a subcontractor's unsafe work practice.

21

In that case, the plaintiff was instructed by his foreman to operate a pulley device while standing in an uncomfortable position. As a result, the plaintiff injured his lower back. The plaintiff then sued the general contractor. Bokodi, 312 Ill. App. 3d at 1054-55. We disagreed with the general contractor that its liability should be assessed in terms of premises liability:

> "The flaw in defendants' argument is that plaintiff's claim against them is not really premised upon the existence of some dangerous condition on the land, but upon defendants' negligence in exercising control over their independent contractor." Bokodi, 312 Ill. App. 3d at 1057.

In this respect, Bokodi relied on Haberer v. Village of Sauget, 158 Ill. App. 3d 313, 511 N.E.2d 805 (1987). In Haberer, the plaintiff's job was to mix grout. The plaintiff's employer, however, failed to provide him with protective gloves. As a result of mixing grout by hand without protective gloves, the plaintiff developed dermatitis and, subsequently, an infection. Haberer, 158 Ill. App. 3d at 318. We found that the plaintiff's claim against the village was not truly based on premises liability, but was rather based on the village's negligence in exercising control over its contractor, the plaintiff's employer. Haberer, 158 Ill. App. 3d at 318.

Plaintiff fails to cite any cases that found the theory of premises liability to be applicable under such facts. In any event, no liability could be imposed unless the owner or possessor of the premises had actual or constructive knowledge of the unsafe situation. Cochran, 358 Ill. App. 3d at 873; Restatement (Second) of Torts §343, at 215-16 (1965). Here, as noted, DTM's supplier of shingles had crane-lifted them to the

22

roof. Under these circumstances, DeVincent would have had no reason to think that bundles of shingles would be carried up a ladder. There is also no evidence that DeVincent or James was informed or should have known of a shortage of shingles on the roof, which was discovered the morning of the day of the incident. Even had DeVincent noticed a shortage of shingles on the roof, he would have had no reason to think that, rather than having the supplier deliver and lift more shingles to the roof, DTM employees would buy extra bundles elsewhere and proceed to carry bundles up a ladder. Plaintiff places great reliance on DeVincent's statement that he would observe the roofers between 20 and 30 times a day. Ginger Ridge, however, points out that DeVincent stated that at the time of Ceasar's fall he was in his office where he could not see the roofers. Thus, even assuming DeVincent checked on the roofers every 15 minutes, he cannot be charged with knowledge of an unsafe work situation that would take less than a minute to transipre, namely, a roofer picking up a bundle of shingles and starting to climb a ladder with it. Accordingly, there is no genuine issue of material fact as to Ginger Ridge's lack of knowledge of the dangerous work situation.

For the reasons set forth above, we affirm the judgment of the circuit court.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.

23